No. 45,461

HAZEL MARIE SINCLAIR, *Appellant,* v. ROBERT EUGENE SINCLAIR, *Appellee.*

(461 P. 2d 750)

Opinion filed December 6, 1969.

*Murvyl M. Sullinger,* of Pittsburg, argued the cause and was on the brief for the appellant.

*C. R. Stauffacher,* of Columbus, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

O'CONNOR, J.: After a marriage spanning slightly over twenty years, Robert Eugene Sinclair was granted a divorce from his wife Hazel on February 21, 1968. Custody of their two children—Gary and David, ages eighteen and thirteen—was granted to the father. Certain property was set over to each of the parties, and Robert was ordered to pay Hazel the sum of $3,000.

Hazel has appealed and contends the district court erred in: (1) granting a divorce to Robert on the grounds of gross neglect of duty and extreme cruelty, (2) the division of property and alimony award, and (3) awarding custody of the boys to their father.

The marriage was reasonably tranquil until 1966 when Hazel became interested in the teachings of Jehovah's Witnesses and began studying the Bible. As a result her interest in her husband and children gradually waned to the point where she told Robert and the boys her religion meant more to her than her family or anything else. Finally, after Robert told her he would not "live with the religion" any longer, Hazel departed the home in February 1967. Following a short sojourn to Montana, she returned to Kansas and lived apart from her family. Hazel maintained little or no contact with them and did not so much as attend Gary's graduation exercises in June 1967.

On August 31, 1967, Hazel instituted an action for separate maintenance in which Robert filed a cross-petition for divorce. When the case came on for trial Hazel withdrew her petition and the case was heard on the cross-petition. Robert was granted a divorce on the grounds of gross neglect of duty and extreme cruelty about which Hazel now complains on the apparent basis there was no evidence of marital delinquency against her. She contends the evidence all related to acts of indignity and abuse on the part of her husband. The essence of her argument, as we view it, is that we should reweigh the evidence and arrive at a conclusion different from that reached by the trial court. This we decline to do. The trial judge had the duty of determining the weight and credibility to be given the testimony of the witnesses. Our task on appellate review is to examine the record and ascertain whether his findings are supported by substantial, competent evidence. If so, the findings will not be disturbed. (*Cool v. Cool*, 203 Kan. 749, 457 P. 2d 60; *Haynes v. Haynes*, 202 Kan. 83, 446 P. 2d 749.)

According to Robert, when his wife first started studying to be a Jehovah's Witness he "figured any religion was a good religion as long as they believe in God," but then she started asking him if he "would leave money to the clan if she were to die," and stated that "she would let her children die for lack of a blood transfusion and that the world was coming to an end in 1975." Hazel, in her husband's opinion, had undergone a complete personality change: her religion came before everything, she became inattentive to the children and lost interest in their school activities, she no longer believed in Christmas and refused to take part in any of the season's festivities, and she ceased to prepare regular meals for the family as she had done before. By the testimony of Robert, the two boys, and Hazel's own sister, the record leaves no doubt that Hazel had become so obsessed with her religious beliefs and activities that she completely neglected her duties as a wife and mother, and as a result, she and her husband could no longer live together.

The religious zeal of a spouse may be carried to such lengths that domestic harmony is completely disrupted and the legitimate ends of matrimony destroyed, with the result that the life of the complaining spouse is rendered intolerable. (*Mertens v. Mertens*, 38 Wash. 2d 55, 227 P. 2d 724; *Smith v. Smith*, 61 Ariz. 373, 149 P. 2d 683; *Golden v. Arons*, 36 N. J. Super. 371, 115 A. 2d 639; *Krauss v. Krauss*, 163 La. 218, 111 So. 683, 58 A. L. R. 457; Anno. 25 A. L. R. 2d 930 § 2.) Such a course of conduct, we believe, characterizes behavior amounting to extreme cruelty within the purview of our divorce statute. (K. S. A. 60-1601, as amended; *Haynes v. Haynes*, supra; *Saint v. Saint*, 196 Kan. 330, 411 P. 2d 683; *Preston v. Preston*, 193 Kan. 379, 394 P. 2d 43.) Likewise, under the circumstances disclosed in this record, such conduct may constitute gross neglect of duty. (*Haynes v. Haynes*, supra; *Kelso v. Kelso*, 182 Kan. 665, 324 P. 2d 165.) The record discloses ample evidence to support the action of the district court in granting a divorce to Robert.

Hazel also complains the lower court abused its discretion in the division of property and allowance of alimony.

Robert was awarded as his separate property the residence of the parties for which they paid $10,000 and to which they added a shop at a cost of approximately $3,000, subject to a mortgage of about $5,000; the household goods and furnishings; the business and inventory; a 1959 Ford; and a 1964 Chrysler on which there was an encumbrance of $1,400. Hazel was to receive her personal effects,

a 1964 Mercury automobile, and the sum of $3,000, which was to be paid over a period of time.

Hazel, who was thirty-eight years of age, had been employed as a garment factory worker during various periods of the marriage. At the time of trial she was working in a factory located at Carthage, Missouri. She had also helped her husband operate taverns and a taxicab business while he worked on construction jobs. Robert began his present business in early 1959. It was operated out of the shop at the home and consisted of buying used ball bearings, repacking and selling them, and also selling other automotive parts. Hazel helped keep the books for the business. Although Hazel insisted the total inventory value of the shop items was between $10,000 and $15,000, Robert testified the inventory would "run up around $3,000." The bank account fluctuated greatly, depending on the sales and inventory for a particular month. The couple's joint taxable income in 1966 was approximately $11,000.

During the early part of their separation Robert gave Hazel three checks totaling $240 for support. She tore up another check for $500 he had given her. Robert also offered her a small house they owned in "East Town," but she declined the offer. With Hazel's consent the house was finally sold for a nominal sum and the proceeds deposited in a savings account for the children. On one occasion Hazel stated all she wanted from the marriage was the car.

Actually, the record is not clear as to whether the $3,000 ordered paid to Hazel was intended as alimony or as a part of the order dividing the property. Regardless, we have concluded the court did not abuse its discretion in its decree settling the property and alimony rights of the parties.

The division of property, as well as the allowance of alimony, rests within the sound discretion of the trial court, whose judgment will not be disturbed in the absence of a clear showing of an abuse of that discretion. (*Cool v. Cool*, supra; *Clugston v. Clugston*, 197 Kan. 180, 415 P. 2d 226; *Saint v. Saint*, supra; *Preston v. Preston*, supra.) In our decisions we have noted many factors which may be considered in determining whether a just result in the division of property and computation of alimony has been achieved. (See, e. g., *Moran v. Moran*, 196 Kan. 380, 411 P. 2d 677; *Cool v. Cool*, supra; *Saint v. Saint*, supra; *Zeller v. Zeller*, 195 Kan. 452, 407 P. 2d 478.) Additionally we have here a father with virtually the entire financial burden of supporting and educating two teen-aged

sons. Even if we consider the $3,000 awarded Hazel as being in the nature of a division of property rather than alimony, we are unable to say the trial court erred. Although alimony may be awarded to a party irrespective of fault (*Zeller v. Zeller*, supra), the court may, in its discretion, refuse to grant any alimony at all (*Cool v. Cool*, supra.) Whether we would have made the same determination as the trial judge in this case is of no moment, for under all the circumstances we are satisfied the bounds of judicial discretion were not exceeded.

Finally, Hazel contends the lower court abused its discretion in granting custody of the boys to Robert. She urges that the court's decision was based solely on the ground of religion, which is impermissible under *Jackson v. Jackson*, 181 Kan. 1, 309 P. 2d 705. The case is clearly distinguishable. The import of our holding in *Jackson* was that religious views alone afford no ground for depriving custody to a parent who is otherwise qualified. Here, the religious beliefs of Hazel precipitated a course of action on her part of utter disregard and indifference to her children and their activities. Several events have already been mentioned. In addition, we note that after Hazel left home in February 1967 she did not contact the boys for nearly six months, and thereafter no more than three times until the time of the divorce in February 1968. At the trial both boys expressed a strong desire to remain with their father. The paramount consideration of the court in custody cases between parents is always the welfare and best interests of the children. The trial court is in the most advantageous position to make the inquiry and determination, and in the absence of abuse of sound judicial discretion, its judgment will be upheld on appeal. (*Greene v. Greene*, 201 Kan. 701, 443 P. 2d 263; *Moran v. Moran*, supra; *Gardner v. Gardner*, 192 Kan. 529, 389 P. 2d 746.) We find nothing in the record which would justify our disturbing the custody order of the lower court.

The judgment is affirmed.