[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 431 
From a divorce decree rendered by the Circuit Court of Madison County awarding custody of the minor child to the father, the mother, Renee Bissell Clift, prosecutes this appeal.
She contends the trial court erred to reversal by:
(1) Allowing introduction of testimony regarding her religious beliefs;
(2) Granting custody of a child of tender years to the father, in the absence of a showing that the mother was unsatisfactory or unfit;
(3) Failing to award sufficient alimony in gross to a woman with no job, income, or estate. We are in agreement with the wife with respect to her first and third contentions. Accordingly, as stated below, the judgment of the trial court is to be affirmed in part and reversed and remanded in part.
The record reveals the following:
The parties met at the University of Alabama, and after a courtship of approximately four years, were married on December 26, 1970. Their son, John Thomas Clift, was born on December 3, 1971.
After their marriage, the couple lived in a residence on a farm in Madison County, Alabama. The residence is located on a 60 acre tract of which the appellee-husband, Jack Thomas Clift, Jr., and the appellant-wife each own a 23/128 interest. They obtained this interest by gift from the husband's aunt. Appellant-wife valued her property interest at $3,000. The remainder of the interest in the 60 acre tract is owned by the husband's parents, who additionally own approximately 690 acres of adjacent farmland.
Sometime in 1972, the appellant-wife became a member of the religious sect known as Jehovah's Witnesses. The appellee-husband did not become affiliated with this group. By March 4, 1976, the parties' marital relationship had so deteriorated that the wife left her husband. She took their child, John, with her. On March 5, 1976, she filed a complaint for divorce in which she sought to have custody of John vested in her. On April 7, appellee-husband filed an answer and counterclaim in which he alleged:
 "[T]hat the plaintiff [wife] is not fit to exercise the custody, care and control of the parties' minor child and it would not be in the best interests of the child for her to be granted the custody, care and control of said child because the plaintiff is a member of the religious sect known as Jehovah's Witnesses and defendant avers that the principles and teachings of that religion which the plaintiff has adopted, are such that it would be in the best interests of said child for his father to be granted his custody, care and control."
At the trial, conducted on June 8, 9, and 10, 1976, the appellant-wife testified as follows about the appellee-husband: that he taught the child to disrespect his mother; that he became embarrassingly drunk three times a year; that he attempted to induce his wife to make false statements to enable him to be absent from National Guard activities; that he had killed kittens with a hoe and thereafter, had eaten without *Page 432 
washing his hands; that he had locked his wife out of the house and threatened to shoot her as a burglar if she ever again entered the dwelling through a window; that he had kicked his wife in the buttocks and made derogatory remarks to her in front of the child; that he had experimented with marijuana; that he had gone to church one time in five years.
Concerning her conduct, she stated: that she had drunk with her husband on some occasions when he had become so intoxicated that she had had to drive the couple home; that neither party habitually drank at home in the evenings; that she had also experimented with marijuana in 1972-73, when her husband had used the substance; that she had never been arrested.
Appellee-husband's testimony regarding these incidents varied somewhat from those of the wife. He expressly denied both asking her to make a false statement regarding his National Guard activities and also threatening to shoot her. He admitted that he and his brother-in-law had exterminated some kittens because of the excessive number present at the farm, although he denied having done it with a hoe in front of the wife. He stated that he might have kicked his wife in the buttocks when she disobeyed him and admitted having told John that his mother was "messed up in the head." On at least two occasions, he stated that after consuming alcoholic beverages his wife had driven them home in their automobile. He estimated his church attendance at six times in four years.
The appellant-wife was not working at the time of trial. She stated that she was not trained for any type of employment but had approximately three years of credit toward a secondary teaching certificate in the subject of biology. She declared a willingness to try to work and indicated she might complete her college education. She said it would take approximately a year and one quarter and $1,000 to $1,500 to obtain her degree. At the time of trial, she had neither inquired about completing her education nor interviewed to procure employment.
Subsequent to the separation, appellant-wife and John shared a bedroom in her mother's six bedroom home. Her mother is an unemployed schoolteacher, who is also a member of the Jehovah's Witnesses. In addition to appellant-wife, her mother, and John, four other individuals lived in the house; two of appellant-wife's sisters, her younger brother, and a seventeen year old who had been placed with her mother by the Department of Pensions and Security. The two sisters are aged 25 and 14. The 25 year old works as a "nanny" for another couple taking care of their children. The 14 year old attends public school. Appellant-wife's 16 year old brother does not attend public school but is enrolled in a correspondence school. The 17 year old also attends public school. Thus, the record reveals that the only employed member of the group is the 25 year old sister.
Appellee-father is a self-employed farmer. From the time of the parties' marriage until 1976, he had managed his father's farm. His adjusted gross income for 1972, 1973, 1974, and 1975, was approximately $9,000, $10,000, $13,000, and $11,000, respectively. Commencing in 1976, he entered into a new agreement with his father whereby he leased 500 of his father's 1,600 acres for farming. Payment consisted of 25% of the cotton he produced on the 500 acres. Appellee-husband stated that the 1976-1977 cotton crop had "black root" and the profit to be derived from its harvest was uncertain. As of June, 1976, sale of soybeans harvested in 1975 earned $2,000 in gross income for him for the year. At the time of trial, appellee-husband's indebtedness on the cotton crop totaled $37,000; $12,000 to his father and $25,000 to a bank. His line of credit with the bank was limited to $95,000. He also had made arrangements to purchase $70,000 worth of farm equipment from his father. Appellee-husband's monthly living expenses totaled approximately $350 per month. He made no cash disbursements for rent.
According to the appellee-husband, the nature of his work would allow him to spend approximately 75% of his time with *Page 433 
the child. He stated that he had hired laborers to do most of the actual farming and that his duties were principally managerial and supervisory in nature. Appellant-wife confirmed that prior to the separation, the husband and child spent more time together than did father and child in the average home.
Appellee-husband testified that if he were awarded custody of the child they would continue to live in the house on the farm where the three had lived prior to the parties' separation. He stated that there were streams and ponds on the farm where he and the child could fish. He noted that his parents' house was approximately 4 1/2 miles away, and they had a swimming pool and horses which were freely accessible to John and him.
He stated that on those occasions when he would be unable to be with John, three options were available to him. His mother could care for the child; or his sister and her husband who were building a home two miles from his residence and who had two boys, ages 6 and 3, could keep John. He said he also had looked into the possibility of sending John to a nursery school operated by a Baptist Church in Madison, Alabama.
In addition to the above testimony, the court, over her counsel's timely objection, compelled the appellant-wife and allowed the appellee-husband to answer certain questions concerning the wife's religious beliefs. It is this action which constitutes the basis for two of her contentions on appeal.
As previously noted, appellant-wife is a Jehovah's Witness and professes to believe in certain religious tenets held by members of that faith. In the trial below, she stated that she does not celebrate Christmas; that she would not have a birthday party for the child; and that she would not give him a birthday present as such, although she might otherwise give him gifts. She admitted having made statements to the appellee-husband within a year prior to the divorce to the effect that all churches and governmental organizations were led by the devil and that she therefore would not vote or otherwise participate in the electoral process. She said she hoped that she would be able to teach the child not to kill and, if necessary, to prove himself a conscientious objector in court to enforce this conviction and avoid military service. She also stated that she would teach the child to respect and obey the law.
Jehovah's Witnesses apparently believe that the end of the world is imminent, and in conjunction with this belief, the appellant-wife stated her belief that long range plans are unnecessary and fruitless. She was uncertain as to whether she would have already begun a college education fund for the child, as had the appellee-husband.
The record also reveals the following testimony by appellant-wife:
 "Q Would your religious beliefs prohibit you from allowing John, your son, to receive a blood transfusion if one were recommended by competent medical authority?
. . . . .
 "A If placed in the situation, again, all I can say is, in my heart I say I would not give him blood; but, in actuality, I don't know what I would do until I am faced with that. I can't say what I will do. That's all I can say. Even for my own self, I don't know what I would do."
Appellee-husband's testimony concerning his wife's religious convictions corresponded to her testimony.
Prior to rendering his decree, the learned trial judge stated:
 "Now, when I deal with the custody of this child, the Court, of course, must not do it on a religious basis as has been mentioned in this case many times. I should not deny the mother custody of the child because she is a Jehovah's Witness, and I should not deny the father custody of the child because he is a Baptist. If either of these religions by proof should show that there is something that may happen to the child that is not in its best interest, of course, the Court should consider it and the Court has considered it." *Page 434 
He then granted the divorce and awarded custody of the child to appellee-husband. Appellant-wife was given visitation privileges on the first and third weekend of each month and from June 15 through July 31 of each year. Holiday custody privileges were equally divided between the parties. Additionally, the decree provided:
 "2. That the personal property owned by the parties or accumulated by them during the marriage shall be equally divided. . . .
 "3. That the defendant shall pay to the plaintiff as alimony in gross the sum of One Thousand Two Hundred ($1,200.00) Dollars, payable Two Hundred ($200.00) Dollars a month for a period of six (6) months, the first payment to be due within ten (10) days of the date of this decree and a like payment on the same day of each of the following five (5) months, the Court taking into consideration in making this award the fact that at the time the parties separated on or about March 5, 1976, plaintiff took Two Thousand Five Hundred ($2,500.00) Dollars which belonged to the parties, which the Court does hereby award to plaintiff in addition to the said One Thousand Two Hundred ($1,200.00) Dollars.
. . . . .
 "5. Plaintiff shall pay the fees of her attorney and the Court finds a reasonable fee for his services to be $1,500.00."
Appellant-wife had withdrawn the $2,500 mentioned in the decree from one of her and appellee-husband's joint accounts without the latter's knowledge. At the time of trial, she had $500 from this sum remaining. She had paid her attorney $1,000 and had utilized the remaining $1,000 for her and John's support during the three month separation. Appellee-husband gave her no money in the three month period between the separation and divorce.
Appellant-wife filed a motion for a new trial on July 7, 1976; subsequent to the August 25th denial of that motion, she filed this appeal.
 I
As previously stated, appellant-wife contends that the trial court erred to reversal in allowing introduction of evidence pertaining to her religious beliefs. She contends that consideration of such evidence in a child custody proceeding is an unconstitutional infringement on her right to pursue religious beliefs of her choice. Authorities she cites for this proposition do not support her contention.
66 A.L.R.2d 1410, 1413-14, states:
 "[T]he view taken in the great majority of the decisions which have touched upon the matter seems to be that while the courts in a child custody proceeding cannot pass upon the comparative merits of various religions and controlling effect must be given to the temporal welfare of the child, religious questions may well be bound up in the issue of temporal welfare and, if so, may properly be considered by the court."
Similarly, it has been said:
 "Religion may be an element in the award of custody of infants insofar as it remains a secondary factor to be considered along with all other circumstances weighed to promote the child's best interest and general welfare; in no case may religion be the sole basis upon which a parent or other person is to be deprived of custody." (Religion — A Factor In Awarding Custody Of Infants, 31 S.Cal.L. Rev. 313, 319 (1958).)
We deem this to be the applicable statement of the law.
The Constitution guarantees that citizens of the United States shall be free to pursue the religious beliefs of their choice. Consonant with this First Amendment right, courts have repeatedly declared that religious beliefs alone shall not constitute the sole determinant in child custody awards.Mollish v. Mollish, Tenn.App., 494 S.W.2d 145 (1972); Sinclairv. Sinclair, 204 Kan. 240, 461 P.2d 750 (1969); Quiner v.Quiner, Cal.App., 59 Cal.Rptr. 503 (1967); Welker v. Welker,24 Wis.2d 570, 129 N.W.2d 134 (1964); Frantzen v. Frantzen, Tex.Civ.App., 349 S.W.2d 765 (1961); Salvaggio *Page 435 v. Barnett, Tex.Civ.App., 248 S.W.2d 244 (1952), cert. denied,344 U.S. 879, 73 S.Ct. 176, 97 L.Ed. 681 (1952); Jackson v.Jackson, 181 Kan. 1, 309 P.2d 705 (1957); Smith v. Smith,90 Ariz. 190, 367 P.2d 230 (1961); Cory v. Cory, 70 Cal.App.2d 563, 161 P.2d 385 (1945); Stone v. Stone, 16 Wn.2d 315,133 P.2d 526 (1943); Reynolds v. Rayborn, Tex.Civ.App.,116 S.W.2d 836 (1938).
However, that one's religious beliefs may not serve as the sole consideration in a child custody proceeding does not necessarily preclude exploration into those beliefs. In this state, as in other jurisdictions, the ultimate consideration in determining the proper custody of the child is what is in his best interests. Strickland v. Strickland, 285 Ala. 693,235 So.2d 833 (1970); Williams v. Williams, 54 Ala. App. 703,312 So.2d 396 (1975). Religious beliefs are as diverse as the individuals who comprise the citizenry of this country. Unfortunately, some of these beliefs embrace philosophies which, contrary to being in the best interests of the child, might actually imperil his physical or mental health. Albeit courts are forbidden from weighing the merits of the religious tenets of the various faiths, they nevertheless are not precluded from inquiring into the beliefs of the parties who are seeking custody of the child in order to insure that such beliefs do not endanger the child.
 "When custody of a child is in issue, the court has a narrow scope of inquiry regarding the religious concepts of the parents: Does the prospective custodian hold views which might reasonably be considered dangerous to the child's health or morals? Thus a court would be warranted in denying custody to a parent whose religious notions would prevent such child's receiving vaccinations or blood transfusions." (Welker, supra, 129 N.W.2d at 138)
Where the court prohibited from hearing all testimony regarding religious beliefs, it would never learn of any religious ideas which might reasonably be construed as inimical to the child. We hold that questions concerning religious convictions, when reasonably related to the determination of whether the prospective custodian's convictions might result in physical or mental harm to the child, are proper considerations for the trial court in a child custody proceeding.
Applying this standard to the facts of this case shows the trial court erred. Questions regarding the celebration of Christmas and birthdays or relating to participation in the electoral process or military service are not within the ambit of religious views which may reasonably be construed as endangering the mental or physical health of the child.
However, as shown infra, we do not deem the admission of this evidence to mandate reversal; for the decree of the trial court is supported by other evidence.
 II
Appellant-wife contends that the trial court deprived her of custody of her child solely on the basis of her religious convictions. She also states that the trial court erred by awarding custody of a child of tender years to the father, in the absence of a showing that she was unsuitable or unfit to have custody. We disagree.
That testimony concerning one parent's religious convictions has been introduced does not warrant reversal of the trial court's decree awarding custody to the other parent when the decree is sustainable on other evidence. Meredith v. Meredith,91 Idaho 898, 434 P.2d 116 (1967); Commonwealth ex rel. Derr v.Derr, 148 Pa. Super. 511, 25 A.2d 769 (1942), cert. denied,317 U.S. 631, 63 S.Ct. 57, 87 L.Ed. 509 (1942); Sinclair andSalvaggio, supra.
In Salvaggio, the trial court changed custody of a child from her father and the latter's second wife to the child's natural mother, her father's first wife. The trial court made the following findings of fact:
 "During all the time Lee Salvaggio [father] had the custody of the child he has cared for her with kindness and attention, and has provided a home for the child and also has adequately provided *Page 436 
for all her physical needs. Both Lee Salvaggio and his present wife are devoted to the child and have given it love and care. . . .
 "`Lee Salvaggio is a fit and proper person to have the custody of his child except that he and his present wife, because of their belief that the Bible requires it, propose to teach [the child] that it is wrong to salute the American Flag, and that it is wrong to celebrate and exchange gifts at Christmas and that it is wrong to kill others even in defense of the United States. Lee Salvaggio did not formerly follow such beliefs and was in the late war during which time he was in several battles and saluted the flag.'" (248 S.W.2d at 245-46)
The court's "Conclusions of Law" stated:
 "`The Court is of the opinion that conditions affecting the welfare of [the child] since the rendition of the decree of divorce have materially changed so that it is now to the best interests of said child that her natural mother . . . should have the custody of said child. . . . The changes of condition affecting the welfare of such child include the change in the financial circumstances of [the mother] and her ability to provide a suitable home for her child. However, in arriving at its conclusions, the Court is primarily influenced by the proposed teachings of Lee Salvaggio and his present wife with reference to saluting the flag, fighting in defense of the United States and celebration of Christmas. . . .'" (248 S.W.2d at 246) [Emphasis supplied]
The Texas Court of Civil Appeals noted that religious teachings cannot serve as the basis for determining a child's custody but went on to affirm the trial court's decree, stating:
 "[I]nsofar as the court's order giving the custody to the mother is based on his discretion that a mother's care and attention for a young female child is for that child's best interest, the court's order finds ample legal support." (248 S.W.2d at 247)
As the trial court's findings of fact and conclusions of law demonstrate, the principal consideration in awarding custody of the child to the mother was the father's religious views. Despite the fact that the husband had had custody of the child, was able to adequately support the child, and was not shown to be adversely affecting the child in any manner, the appellate court affirmed the decision of the trial court.
Here, the trial court specifically stated that its decree was not predicated solely on religious convictions, although it did point out that they had been considered. The evidence reveals that the husband will be able to spend approximately 75% of his time with his son. They will live on a farm where they will be able to fish and go horseback riding together. Appellee-husband has had a stable income for five years and will be able to adequately provide for the physical needs of his son. On those occasions when he cannot be physically present with the child, John will be able to stay with his grandmother, aunt and two cousins, or in a day nursery.
On the other hand, the mother's economic future is uncertain. She is untrained and has not worked since the marriage of the parties. There was no showing of what custody arrangements were likely if she obtained employment. In any event, it does not appear that she would be able to spend 75% of her time with John, as would appellee-husband. More evidence for affirmance of the trial court's decree is contained herein than was present in Salvaggio, supra, a case in which the Supreme Court of the United States denied certiorari. 344 U.S. 879,73 S.Ct. 176, 97 L.Ed. 681 (1952). Also, see Battaglia v. Battaglia,9 Misc.2d 1067, 172 N.Y.S.2d 361 (Sup.Ct. 1958).
The wife also contends that her statements regarding the husband, i.e., his killing of the kittens, his drinking, etc., display his unfitness as a parent and reveal that the trial court abused its discretion in awarding custody of the child to the husband. She contends the principle of law which requires that custody of children of tender years be vested in their mother, absent a showing of *Page 437 
unfitness or unsuitability on her part, governs in this instance. Messer v. Messer, 280 Ala. 395, 194 So.2d 552 (1967);Pettis v. Pettis, Ala.Civ.App., 334 So.2d 913 (1976).
Appellee-husband counters with the following language fromLinderman v. Linderman, 49 Ala. App. 662, 664-65, 275 So.2d 342,343-44 (1973):
 "Cases dealing with custody of children are among the hardest to deal with and courts are seldom satisfied in all respects with the results reached; however, the overwhelming consideration in cases of this nature is the welfare of the children. . . . The trial court heard the evidence, observed the witnesses, and based its decision of these factors in arriving at its determination that the welfare of the children would be best served by [the father] having primary custody of the children. There is a strong presumption favoring the trial court's findings in cases of this class. . . . We are further mindful [that] . . . there is no law in this state which gives either parent priority as to the right of custody. It is usually that a child or children, particularly a girl of tender years, is considered to need the peculiar care of the mother, but such consideration is subject to the predominant rule of the best interest and welfare of the child or children. . . .
. . . . .
 "As the Supreme Court of Alabama has stated, `. . . it is not necessarily a question as to what view the reviewing court might have of the evidence, but that if, under any reasonable aspect, the decree below is fairly supported by credible evidence, it is our duty to affirm.' See Lamar v. Lamar, 263 Ala. 391, 82 So.2d 558; Rodgers v. Thornton, 254 Ala. 66, 46 So.2d 809."
In applying the above principles, which in this instance are conflicting, to the facts of this case, we deem the latter must prevail. "All things being equal, the mother is presumed to be best fitted to guide and care for children of tender years."Messer, supra, 280 Ala. at 397, 194 So.2d at 554. Here, we cannot say all things are equal. As previously stated, the mother will presumably be compelled to work and be away from the child. At its inception, the presumption of a mother's being best suited to care for a child of tender years was premised on a different society, wherein the mother's place was in the home where she attended to the children. See Anonymous,55 Ala. 428 (1876); Striplin v. Ware, 36 Ala. 87 (1860). In a case such as this, where the father's work will enable him to spend 75% of his time with his child and the mother, should she find employment, would quite likely be separated from the child, the presumption is not to be accorded the significance it might in other circumstances.
Moreover, appellee-husband has been engaged in the business in which he has demonstrated a capacity to earn a reasonably stable income. He has already begun planning for the child's future. He has made arrangements for someone to keep John in those instances when physical separation is necessary.
Appellant-wife, to the contrary, is doubtful as to what the future holds for her. She is currently untrained and is uncertain what type employment she may eventually find. Although tentative, it seems certain she will be required to work. Custody arrangements for the child at such time were not revealed.
Child custody may be altered at any time upon a showing of changed circumstances. Presently, however, the record does not reveal the plain error or manifest injustice such as to warrant reversal. Turner v. Turner, 46 Ala. App. 350, 242 So.2d 397
(1970).
 III
Appellant-wife also states the trial court abused its discretion in failing to make adequate award of alimony. The record sustains her contention.
This court is cognizant of the established principle of law in this state which declares that where evidence in a *Page 438 
divorce case is heard ore tenus by the trial court, the decree rendered therein is presumed correct and will not be reversed on appeal unless shown to be an abuse of discretion and plainly and palpably wrong. Meyers v. Meyers, 55 Ala. App. 697,318 So.2d 725 (1975). Similarly, we recognize that there is no fixed formula for ascertaining the correctness of the trial court's award of alimony. Caldwell v. Caldwell, 54 Ala. App. 479, 309 So.2d 833 (1975). However,
 "It must depend upon . . . what is just and reasonable. . . .
 "The court may and should inquire into the earning ability of the parties and their probable future prospects, their age, sex, health and station in life; the duration of the marriage, . . ." (Davis v. Davis, 274 Ala. 277, 278-79, 147 So.2d 828, 830
(1962)
Examination of these criteria with regard to the facts of this case convinces us that, in this instance, the trial court abused its discretion in the award of alimony in gross.
Appellee-husband's average income for the four years preceding the divorce averaged nearly $11,000. Appellant-wife had not obtained employment during the marriage, ostensibly in compliance with her husband's wishes. He desired that she be a full time mother. While the amount of appellee-husband's income for 1976 was tenuous, data from prior years indicates that his earnings will approach $11,000. One neither acquires a $95,000 line of credit with a lending institution nor plans to purchase $70,000 worth of equipment if virtually no income is anticipated. In short, appellee-husband's prospects appear good.
Appellant-wife's prospects do not appear so favorable. After five years of marriage and due in part at least to her husband's wishes, she finds herself unable to procure anything other than menial labor. She has indicated a desire to complete her college education, but the alimony in gross awarded below would not enable her to accomplish this task.
Educational needs are a proper consideration for the trial court in awarding alimony. Phillips v. Phillips, 49 Ala. App. 514, 274 So.2d 71 (1973), cert. denied, 290 Ala. 370,274 So.2d 80 (1973). Moreover, here it does not appear that requiring the husband to pay periodic alimony would overburden him financially. His annual expenses are only $4,200. An increase in the award of alimony would assist appellant-wife in acquiring a degree, thereby providing her an opportunity for a fresh start and a career in her new capacity as an unmarried woman. We realize there was other property involved, but we believe an increase in the award of alimony in gross is required.
Having taken into account the current status of the parties, their future prospects and the reasons therefor, we conclude that in this instance, fairness and justice require appellee-husband to render appellant-wife financial assistance whereby she may at least have the opportunity to acquire a college degree. Accordingly, we hold that the trial court erred to reversal in its award of alimony in gross. The judgment is reversed and the cause remanded for entry of a judgment awarding $200 per month for 12 months as alimony in gross.
Appellant-wife's attorney has also requested that the court award him a fee for representing the wife on appeal. A fee of $500 is hereby awarded.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED WITH DIRECTIONS.
WRIGHT, P.J., and BRADLEY, J., concur. *Page 439