[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 449 
The Madison Circuit Court granted William Stanley Mashburn's petition for modification in which he sought custody of his minor child, a daughter. The child's mother, Laura Snider, appealed from the trial court's judgment. A unanimous Alabama Court of Civil Appeals affirmed the trial court's judgment without opinion, Snider v. Mashburn (No. 2030302, Oct. 15, 2004),921 So.2d 478 (Ala.Civ.App. 2004) (table), and Laura petitioned this Court for a writ of certiorari. Based on our preliminary review of the grounds set forth in the petition, we granted the writ, which we now quash. Although Justice Parker concurs in our decision to quash the writ as to the grounds stated in Laura's petition, he dissents from the decision to quash the writ, because he considers meritorious a ground not set forth in the petition. Therefore, in order to provide full context, we first explain the basis for concluding that the writ should be quashed. We then explain why we disagree with Justice Parker's conclusion that we should address an issue not raised in Laura's petition.
 I. Factual Background and Course of Proceedings
Laura and William were divorced in May 1997 when their daughter was 5 1/2 months old. By agreement, Laura, who was living in Cullman at the time, was given custody. In November 1999, Laura remarried, and she and the child moved to Birmingham to live with Laura's husband, Brian. Sharp conflicts arose as to what standards and practices were to be used in caring for the child during William's exercise of his visitation rights (as to watching TV and movies, dressing the child, etc.). *Page 450 
Brian and Laura spend a significant portion of their time preparing video documentaries for a missionary named David Cloud. In December 2002, Laura, Brian, and the child moved to a rural area of Indiana in order for Brian and Laura to be located closer to their missionary work. Additional disputes arose between the parties regarding Brian's relationship with the child and regarding the use of corporal punishment in Brian and Laura's home.
William petitioned the trial court for a change in custody, which the court granted. Laura appealed to the Court of Civil Appeals, which unanimously affirmed the trial court's judgment. Laura filed a petition with this Court for a writ of certiorari, in which she claimed that the Court of Civil Appeals' affirmance of the trial court's ruling conflicts with Ex parte McLendon,455 So.2d 863 (Ala. 1984), which held that, before a parent may reclaim custody of a child, he or she must show that the change of custody will materially promote the child's welfare. Laura also claimed that the ruling of the Court of Civil Appeals conflicts with Clift v. Clift, 346 So.2d 429 (Ala.Civ.App. 1977), which held that a change in a parent's religious beliefs cannot be the sole factor considered in a child-custody determination but that "questions concerning religious convictions, when reasonably related to the determination of whether the prospective custodian's convictions might result in physical or mental harm to the child, are proper considerations for the trial court in a child custody proceeding."346 So.2d at 435. We granted Laura's petition so that we could review the entire record.
 II. Standard of Review "When evidence in a child custody case has been presented ore tenus to the trial court, that court's findings of fact based on that evidence are presumed to be correct. The trial court is in the best position to make a custody determination — it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing."
Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala. 1996). "`"[W]e will not disturb the trial court's findings of fact unless those findings are plainly and palpably wrong and not supported by the evidence." Williams v. Lide, 628 So.2d 531, 534 (Ala. 1993). . . .'" Ex parte N.L.R., 863 So.2d 1066, 1068 (Ala. 2003) (quoting Eubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala. 1999)). In Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001), this Court stated:
 "When this Court reviews a trial court's child-custody determination that was based upon evidence presented ore tenus, we presume the trial court's decision is correct: `"A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong. . . ."' Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994), quoting Phillips v. Phillips, 622 So.2d 410, 412
(Ala.Civ.App. 1993) (citations omitted). This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases."
(Emphasis added.)
 III. Grounds Presented in the Petition for the Writ of Certiorari A. Conflict with McLendon
Laura argued in her petition for a writ of certiorari that the affirmance by *Page 451 
the Court of Civil Appeals of the trial court's ruling conflicts with McLendon, supra, which states:
 "`Where a parent has transferred to another [whether it be a non-parent or the other parent], the custody of h[er] infant child by fair agreement, which has been acted upon by such other person to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless [s]he can show that a change of the custody will materially promote h[er] child's welfare.'
". . . .
 "`. . . [T]he party seeking modification [must] prove to the court's satisfaction that material changes affecting the child's welfare since the most recent decree demonstrate that custody should be disturbed to promote the child's best interests. The positive good brought about by the modification must more than offset the inherently disruptive effect caused by uprooting the child. Frequent disruptions are to be condemned.'"
455 So.2d at 865. Based on McLendon, it was William's burden at the custody hearing to show that a change in custody would materially promote the child's welfare, would be in her best interests, and would offset the effect of uprooting her from Laura and Brian's home in Indiana.
Justice Parker's dissenting opinion presents what he contends are the facts involved in this case. In presenting those facts, however, Justice Parker views the evidence most favorably to Laura, the party who did not prevail after the ore tenus hearing in the trial court. Viewing the evidence from that perspective, however, is not appropriate. See Ex parte Dan River, Inc.,794 So.2d 386, 394 (Ala. 2000) ("We are bound to accept the tendencies of the evidence most favorable to the winner of a judgment based on evidence ore tenus."). See also Ex partePielach, 681 So.2d 154, 154-55 (Ala. 1996):
 "The appellate courts are not allowed to substitute their own judgment for that of the trial court if the trial court's decision is supported by reasonable inferences to be drawn from the evidence. Ex parte Kent Corp., 641 So.2d 242 (Ala. 1994). The reason for giving such deference to the trial judge's findings based on disputed evidence in ore tenus proceedings is that the trial judge has the benefit of observing the witnesses' manner and demeanor and has the better opportunity to pass upon the credibility of their testimony."
We set out below the trial court's findings adverse to Laura, and we then summarize the evidence presented in her favor.
In its order granting William's petition for modification, the trial court stated:
 "This Court finds from the evidence that the present husband of the Mother, Brian Snider, has engaged in a concerted pattern of behavior intended to control, both physically and emotionally, and isolate the Mother, and as a direct consequence, the parties' minor child, . . . who is presently six years of age, having been born on November 12, 1996. This Court finds that the conduct of Brian Snider, as it directly relates to and affects this child, is extremely detrimental, both physically and emotionally, to the child; and further finds that the Mother has participated in, condoned, and/or, at the very least, acquiesced to the actions of her husband. The evidence presented to this Court in the trial of this case included the following facts:
 "(a) The child was encouraged to call *Page 452 
Brian Snider `Papa.'[1]
 "(b) Brian Snider hit the child in the head with his hand in an attempt to discipline the child for saying something that he felt was wrong. The child was only five years old at the time. Even though Brian Snider acknowledges that his doing so was totally inappropriate, the testimony of the Mother was that he was `out of control' at the time, and that she did not do anything about it. When confronted by the Father about his striking the child in the head, Brian Snider refused to assure the Father that it would not happen again.
 "(c) Brian Snider whipped the parties' child when she told the Mother and Brian Snider that she had watched a PG-13 movie, `Miss Congeniality,' with the Father and others while she was visiting with her Father. This Court finds the actions of Brian Snider in doing so to be unconscionable.
 "(d) The Mother and Brian Snider relocated their residence, and the residence of the parties' child, to a very rural area in the State of Indiana, even though neither of the parties had any family, nor established business, in the State of Indiana. In doing so, the Mother and Brian Snider isolated and removed this child from the large and loving family support system that she had previously enjoyed in the State of Alabama, which consisted not only of the Mother's family, and the Father, but the family of Brian Snider as well, with whom the child also enjoyed a close and loving relationship. As admitted by the Mother in her testimony, the move to Indiana was of `no benefit to the child.'
 "(e) The Mother and Brian Snider have told this child that her Father and maternal grandfather are `going to hell,' knowing that the people referred to are loved and cared for very much by the child.
 "(f) Brian Snider has alienated every member of the Mother's family, with whom the child and the Mother enjoyed a close and loving relationship prior to her marriage to Brian Snider. By doing so, her family support system was eliminated; and Brian Snider succeeded in becoming the only source of support available to the Mother, making her thereby completely dependent on him and him alone.
 "(g) The alienation of the Mother and the child from her family is so complete that the Mother testified that she did not think that it was positive for the parties' child to have contact with her family, except under her direct supervision and only for a short time interval; and that she is not willing to foster a good relationship between the child and the members of her family. The Court notes from the testimony that the family from whom the Mother and child are now alienated provided her not only a place to live, but for the support and care of the parties' child following the separation of these parties; and had at all times prior to her marriage to Brian Snider, enjoyed a close, loving relationship with the child.
 "(h) Brian Snider, on one occasion, chastised the child for going with her grandparents to the theater to see the Disney movie `Finding Nemo.' On another occasion, he and the Mother forcibly removed the child from the physical custody of the Mother's sister during the Father's period of visitation, simply because the Mother's sister had been allowed *Page 453 
by the Father to take the child to the birthday party of her maternal grandmother.
 "(i) Even though the Mother had only dated Brian Snider for two months prior to their marriage, within six months of their marriage, Brian Snider and the Mother approached the Father and requested that he allow Brian Snider to adopt [the child]. The Father adamantly refused to do so.
 "(j) Brian Snider has actively interfered with the communications between the Father and the Mother, and the decisions to be made by them concerning their child, to the point that the exercise of visitation by the Father with the child could only be accomplished with undue and unnecessary pressure and hardship.
 "(k) The Mother testified that the relationship of the parties' child, . . . with Brian Snider is more important than her relationship with the Father, because Brian Snider `spends more time with her.'
 "(l) Brian Snider testified that the parties' child, . . . is `caught in the middle,' and is getting `mixed signals' as a result of the differences between the parties' households. However, the actions of Brian Snider, and the rigid and controlling manner in which he has dealt with the parties' child, has greatly exacerbated the emotional pressures put on this child as a result of those differences.
 "(m) The Mother has indicated that she is submissive to Brian Snider, which is certainly her decision to make; but further asserted that `[the child] is under his (Brian Snider's) control, too.'
 "(n) The actions of Brian Snider resulted in a significant and detrimental change in the personality and behavior of the child, which this Court finds to have been a direct result of his conduct towards her. The Court finds that since she has been placed in the pendente lite custody of the Father, the child is now happy and well adjusted, and is being well cared for by the Father in his household.
 "(o) Brian Snider and the Mother made demands on the Father for him to conform his household to adhere to their demands, including the child wearing long clothing, no mixed swimming by the child with members of the opposite sex, and even to the extent of not allowing the Father to place the child in summer care at the local YMCA. When the Father refused on one occasion to accede to her demands, the Mother brought law enforcement officers to the Father's home to get the child.
 "(p) This Court finds the Father to have a calm and non-aggressive personality; and that he did not exhibit any hostility towards the Mother or Brian Snider in his testimony, but rather exhibited a genuine concern for the health and welfare of his child. The Court also found the members of the Mother's family, who testified in support of the Father in this case, to be loving, and without hostility towards the Mother."
We have reviewed the entire transcript of the final custody proceeding. No useful purpose would be served here by further elaboration of the ample evidence supporting the trial court's findings.
Of course, as is usually the case in these types of proceedings, the evidence is not wholly one-sided. We note that Laura testified that she and the child play games together, that they go horseback riding, and that they used to go ice skating.[2] *Page 454 
Laura also testified that she is a competent homeschool teacher, and that the child has progressed under her teaching. She further testified that since she and Brian married, the child has visited Yellowstone National Park, Mount Rushmore, the Statue of Liberty, Washington, D.C., and Nepal. All of this travel was associated with the ministry work in which Laura and Brian are involved, although Laura testified that she plans to decrease her travel now that the child is older.[3] Laura also testified that, after she and William were divorced, William took advantage only of approximately half of his allotted visitation time with the child. She also testified that William is a racist.
Brian testified that William attacked him on one occasion, unprovoked, although William testified that Brian provoked the attack by repeatedly poking him in the chest. There was additional testimony indicating that William drinks regularly, although not to the point of intoxication, and that he has roughly $24,500 in unsecured credit-card debt. Lastly, there was testimony indicating that William's mother, who sometimes cares for the child, has bipolar disorder, although with medication she keeps her symptoms under control.
The trial court referred to Brian Snider's control over the child as having the effect of isolating the child from her natural father and from her extended family, all of whom, according to the trial court, were loving providers and part of the child's support system. Brian's "control" of the child effectively excluded William's views regarding the upbringing of his daughter and led to the isolation of the child from all other members of her family, including Laura's own father and stepmother who, as previously noted, testified in favor ofWilliam, their former son-in-law, in this proceeding.
The trial court found, and the record shows, that Brian spanked the child for watching a movie that was rated PG-13[4]
while she was visiting her father. However, the trial court cited the incident not because the court believes that children should not be punished for watching what some parents might consider inappropriate movies, but because Brian punished the child fordoing something that her natural father gave her expresspermission to do. The trial court found this conduct to be "unconscionable" and, therefore, against the child's best interests.
The existence of conflicts in the evidence at the hearing, standing alone, does not warrant reversal, because the trial court's findings of fact, along with the custody determination itself, are afforded a presumption of correctness. And this Court cannot conclude based on the record before us that the trial court's transfer of custody to William was "plainly and palpably wrong." Ex parte Fann, 810 So.2d at 633. Therefore, the Court of Civil Appeals' affirmance of the trial court's judgment does not, as Laura contends, conflict with McLendon. *Page 455 
 B. Conflict with Clift
Laura also argued in her petition for a writ of certiorari that the ruling of the Court of Civil Appeals conflicts with Clift, supra, which holds that "religious beliefs alone shall not constitute the sole determinant in child custody awards."346 So.2d at 434. The record does reveal that the majority, if not all, of the actions taken by Brian and Laura with regard to the child were pursued in adherence to their religious beliefs. However, while Clift did hold that religion cannot be thesole determinant in a child-custody award, it also recognized:
 "[T]hat one's religious beliefs may not serve as the sole consideration in a child custody proceeding does not necessarily preclude exploration into those beliefs. In this State, as in other jurisdictions, the ultimate consideration in determining the proper custody of the child is what is in his best interests. . . .
"`. . . .'
 ". . . We hold that questions concerning religious convictions, when reasonably related to the determination of whether the prospective custodian's convictions might result in physical or mental harm to the child, are proper considerations for the trial court in a child custody proceeding."
346 So.2d at 435 (emphasis added). Thus, the trial court was not precluded from considering the effect on the child of Brian and Laura's parenting practices simply because those practices were based on religious beliefs. The trial court found that "[t]he actions of Brian Snider resulted in a significant and detrimental change in the personality and behavior of the child, which [the court found] to have been a direct result of [Brian's] conduct towards her," and that "since she has been placed in the pendente lite custody of [William], the child is now happy and well adjusted, and is being well cared for by [William] in his household."
The record reveals evidence sufficient to support the trial court's ruling, and in its written order, the court expressly states that it did not rely solely on religion in making its decision:
 "This Court has not decided this case based on the religious beliefs of either of the parties to this action. While it is true that there is considerable difference in religious beliefs between the households of the parties, this Court does not find it appropriate, legally or otherwise, to base its decision on whether or not this Court agrees or disagrees with a party's religious beliefs."
The fact is that the evidence was in dispute, but it is clear from a reading of the record that the trial court's findings of fact and its determination that a change in custody would materially promote the child's welfare were not plainly and palpably wrong. See generally Pielach, 681 So.2d at 154 ("The appellate courts are not allowed to substitute their own judgment for that of the trial court if the trial court's decision is supported by reasonable inferences to be drawn from the evidence.").
The trial court was obviously impressed with the solidarity of the child's extended family in its support for the change of custody to William.[5] At the time of the final hearing, the child had been living with William for five months. Laura's father described the personality and behavioral changes in his daughter and granddaughter after Laura's marriage to Brian, as well as his granddaughter's return to *Page 456 
normal after custody had been awarded to William pendente lite.
We conclude that the trial court did not base its ruling solely on the religious beliefs of Brian and Laura (or, for that matter, William), but rather on the best interests of the child. Because the trial court's order was not based solely on the religious beliefs of any of the parties involved in this case, the Court of Civil Appeals' affirmance of the trial court's ruling does not conflict with Clift.
 IV. Grounds Not Presented in the Petition for Certiorari
The dissenting opinion of Justice Parker concedes the correctness of this Court's conclusion that we should not grant review of the trial court's determination as to custody. The dissenting opinion also acknowledges that Laura failed to assert as a ground for issuance of the writ of certiorari any error with respect to the trial court's restriction upon her conduct during her visitation with the child. The dissent urges this Court to disregard what it refers to as a "legal nicety" and consider the validity of this restriction, pointing to a paragraph in Laura's brief, in which she contends that the trial court "exceeded its authority by restricting the Mother by only permitting her to train the child in her religious views `by example.'" (Laura's Brief at 38-39.)[6]
Assuming, for the sake of argument, the validity of Justice Parker's contention that in a child-custody case we can overlook all procedural shortcomings, we cannot agree with the conclusion in the dissenting opinion that what it describes as the trial court's "sweeping directive" in this proceeding violates Laura's constitutional right to free exercise of religion.
The trial court's order states:
 "[T]he religious training of the child while in the home of the Mother for visitation shall be made by example, and not by any religious training which would otherwise be disparaging or critical of in any way the beliefs of the Father, and/or the way in which his household is conducted."
Because Laura did not challenge the trial court's order by any posttrial proceeding raising the point she now advances in her brief to this Court, we are faced with a question of how to interpret the trial court's order. In this context, we lack the trial court's reaction to Laura's broad reading of the order and are therefore placed in a position analogous to a court's being called upon to interpret the effect of a previous order in a proceeding. In Moore v. Graham, 590 So.2d 293, 295
(Ala.Civ.App. 1991), the Alabama Court of Civil Appeals, citingHanson v. Hearn, 521 So.2d 953 (Ala. 1988), accurately summarized this Court's holdings as to the construction of judgments as follows:
 "Judgments are to be construed like other written instruments. The rules applicable to the construction and interpretation of judgments are those applicable to the construction and interpretation of contracts. Hanson v. Hearn, 521 So.2d 953 (Ala. 1988). Separate provisions of judgments, like provisions of contracts, should be construed in pari *Page 457 
materia, and the entire judgment — all provisions considered — should be read as a whole in the light of all the circumstances, as well as of the conduct of the parties. Id. Further, if the terms of a judgment are not ambiguous, they should be given their usual and ordinary meaning."
In the context of construing contracts, this Court has said that "[u]nder . . . established rules of contract construction, where there is a choice between a valid construction and an invalid construction the court has a duty to accept the construction that will uphold, rather than destroy, the contract." Homes ofLegend, Inc. v. McCollough, 776 So.2d 741, 746 (Ala. 2000). See also Clark v. Board of Dental Exam'rs of Georgia, 240 Ga. 289,294, 240 S.E.2d 250, 254 (1977) ("`When a judgment is susceptible of two meanings, one of which would render it illegal and the other proper, that construction will, if reasonably possible, be given it that would render it legal.'" (quoting Byrd v.Goodman, 195 Ga. 621, 25 S.E.2d 34 (1943))).
The dissenting opinion reads the trial court's order too broadly in agreeing with Laura's characterization in her brief of the order, which she says confines her exclusively to training the child in her religious views "by example." Yet the order does not stop with the reference to training by example. It goes on to condemn "religious training which would otherwise be disparaging or critical of in any way the beliefs of the Father, and/or the way in which his household is conducted."[7] By clear implication, the order countenances religious training on a broad spectrum, so long as it does not run afoul of the trial court's prohibition against the disparagement of William's beliefs. Cf.Hagler v. Hagler, 460 So.2d 187, 189-90 (Ala.Civ.App. 1984) (recognizing the trial court's discretion in dealing with instances in which a custodial parent uses that position to alienate the child from the other parent). Nothing in the trial court's order prevents Laura from teaching the child every facet of the Christian faith and every principle and lesson contained in the Bible. This can be done by any parent without disparaging or criticizing his or her former spouse.
In her brief in support of her petition for certiorari, Laura cites Ex parte Hilley, 405 So.2d 708 (Ala. 1981), a child-custody case.[8] Because the mother in Hilley, who had been awarded custody of her children, was an evangelist and church-choir member, she attended church frequently, sometimes until 11:00 p.m. or later, and she would take her children with her. The trial court awarded custody of the children to the mother, but conditioned that custody award as follows:
 "`That during the time that the children are in the care, custody, and control of [the mother], she will curtail all activities that require her to be away from the children, or requires the children to travel from the home during the week except for one church function of reasonable duration and normal school and social functions in which the children may become involved.'"
The trial court stated that, but for the restriction quoted above, it would have awarded custody of the children to their father. *Page 458 
This Court held that the trial court's order unduly restricted the mother's right to practice her religion. The Court distinguished orders involved in similar, but not identical, cases:
 "In none of the cited cases did the orders prohibit the parents from themselves following and/or engaging in the beliefs and practices of their chosen religion. The orders merely prohibited the parents from binding the children to their particular beliefs or practices when they threatened the health or welfare of the children. The order in the present case, however, goes beyond that. It effectively restricts [the mother's] free exercise of her chosen religion by providing that `she will curtail all activities that require her to be away from the children. . . .' Thus, [the mother] is not free to attend church or other church related activities during that time when the children are out of school because the order does not permit her to leave the children in the care of a babysitter or other suitable attendant."
405 So.2d at 711 (emphasis added). The Court, by noting that a babysitter or other attendant would have been a better means of avoiding keeping the children up and out at all hours of the night, implicitly recognized that it might not be in the best interests of the children to attend all of the church services the mother attended. Put another way, it appears that an order prohibiting the mother from taking her children to all of the church functions would not have run afoul of her right to free exercise of religion. Hilley, therefore, does not stand for the proposition that a court may never restrict in any way a custodial parent's exposure of her child to the parent's religion.
In the instant case, the trial court prohibited Laura, while teaching her religion to the child, from disparaging the child's father. The child was only 6 1/2 years of age when this order was entered. The trial court did not err in determining that such a restriction was in the child's best interests at the time. We decline to hold that, under the facts here presented, the trial court's order prohibiting a parent from disparaging the other parent violates the first parent's right to free exercise of religion.
The child is now approaching nine years of age. If Laura considers that circumstances with respect to the child's current level of maturity or other circumstances warrant greater freedom on Laura's part during visitation with respect to the child's religious training, including latitude to make comments she might deem appropriate about her father's and grandparents' faith, a motion in the trial court seeking such relief is the appropriate vehicle.[9] That procedure will give the trial court the opportunity to address an issue not heretofore raised[10]
and decide that issue in light of the circumstances then presented, the authorities marshaled so forcefully in the dissenting opinion, and whatever additional authorities Laura and William may submit. And, for all that appears, some or all of these issues may well be resolved by mediation in the trial court. Further, in the *Page 459 
event that the case reaches this Court, we will have the benefit of the trial court's reasoning, as well as that of the Court of Civil Appeals, presumably a petition adequately stating grounds, and briefs from both parties fully developing these important issues.
 V. Conclusion
The Court of Civil Appeals' affirmance of the trial court's judgment does not conflict with the cases relied upon by Laura in her petition for a writ of certiorari. Because the trial court's order, when read fairly and objectively, does not impermissibly infringe upon Laura's right to the free exercise of her religion, this case does not warrant the exercise of the Court's power to overlook Laura's failure to assert the ground, based on her reading of the order, in her petition for the writ of certiorari. Without in any way denigrating Justice Parker's views on the importance of religion in society, we do not think this case provides the appropriate occasion for further consideration of these important constitutional issues. We therefore quash the writ.
WRIT QUASHED.
NABERS, C.J., and SEE, HARWOOD, STUART, SMITH, and BOLIN, JJ., concur.
WOODALL, J., concurs in the result.
PARKER, J., dissents.
[1] The divorce judgment prohibited the parties from encouraging the child to address parties other than William and Laura by names such as "mother" and "father" or words of similar import.
[2] Laura testified that the child's further training in ice skating was discontinued because ice skaters dress in "revealing" outfits and skate to music that is unacceptable to Laura and Brian.
[3] The record reveals that, from February 2001 until October 2002, Laura's and Brian's ministry work took them and the child to Minneapolis, Indianapolis, Waterbury (Connecticut), Brunswick (Maine), Owosso (Michigan), Ontario, Orlando, Montreal, Greenville (South Carolina), and Nepal. Apparently, the trip to Nepal took place shortly after the 9/11 terrorist attacks on the World Trade Center and the Pentagon.
[4] The movie was "Miss Congeniality," starring Sandra Bullock. A PG-13 rating indicates that some material in the movie may not be suitable for children under the age of 13.
[5] Members of Laura's own family supported the change of custody. Indeed, her own parents testified against their daughter, and in favor of their former son-in-law, at the final custody hearing.
[6] Failing to raise an issue in a petition for a writ of certiorari is not a minor error. In fact, had Laura's petition and brief in support been filed after this Court amended Rule 39, Ala. R.App. P., to provide that, before a brief in support of a petition for certiorari may be filed with this Court, we must first grant the petition for the writ, Laura's brief, which was the only filing that contained any reference to the trial court's restriction on religious training, would have been stricken without this Court's having seen it. In petitions filed after the rule change, this Court rules upon a petition for the writ of certiorari without considering any brief impermissibly filed in support of that petition.
[7] As previously noted, the trial court found that "[t]he Mother and Brian Snider have told this child that her Father and maternal grandfather are `going to hell,' knowing that the people referred to are loved and cared for very much by the child."
[8] Hilley is the only authority Laura cites in support of her argument that the trial court exceeded its discretion by restricting her religious training of the child.
[9] See Ex parte Lipscomb, 660 So.2d 986, 989 (Ala. 1994) ("[M]atters of child custody are never res judicata, and the circuit court retains jurisdiction over the matter for modification upon a showing of changed circumstances."). The same rule applies in matters involving visitation. T.K.T. v. F.P.T.,716 So.2d 1235, 1239 (Ala.Civ.App. 1998).
[10] As previously noted, Laura filed no post-judgment motion after the trial court entered its modification order. As also noted, she did not raise the issue in her petition for the writ of certiorari, and she argues it entirely within the span of one page in her brief in support of that petition, where she cites as authority only one case, Hilley.