5 So.3d 1220 (2008)
Rachel Sanders COCHRAN
v.
Gregory Donald COCHRAN.
1061668.
Supreme Court of Alabama.
September 26, 2008.
*1222 Randall W. Nichols of Massey, Stotser & Nichols, P.C., Birmingham, for appellant.
Judy Harrison Barganier and Jamie Guy Ratliff of Law Offices of Judy H. Barganier, P.C., Montgomery, for appellee.
WOODALL, Justice.
Rachel Sanders Cochran appeals from orders of the Montgomery Circuit Court modifying a previous award of custody of the two minor children of her former marriage with Gregory Donald Cochran. We reverse and remand.

*1223 I. Procedural Background

The couple was divorced on February 22, 2001. The marriage produced two children, namely, W.G., born in 1995, and S.S., born in 1998. The judgment of divorce incorporated a settlement agreement executed by the couple, which vested joint legal custody of the children in Mr. Cochran and Mrs. Cochran, with physical custody in Mrs. Cochran. The award of physical custody to Mrs. Cochran was subject to Mr. Cochran's "reasonable visitation" with the children, pursuant to a detailed visitation schedule. Specifically, the children were to be with Mr. Cochran every other weekend from 4:00 p.m. on Friday to 4:00 p.m. on Sunday. They were also to spend "two separate weeks" with him each summer during June, July, or August, the weeks to be designated by mutual agreement. In the absence of an agreement, the judgment provided that Mr. Cochran was to have the children during the "second full week of June and the third full week of July." It also provided that Mr. Cochran would have the children on Father's Day; for spring school holidays during even-numbered years; for Easter during odd-numbered years; for designated hours on Christmas and Thanksgiving; and "any other times mutually agreed upon by the parties." (Emphasis added.)
Paragraph 8(d) of the settlement agreement provided:
"For the month following the month during which the youngest minor child begins first grade (or K-5 if such K-5 program is a full day program) and is no longer in need of childcare services, husband's child support payments shall be reduced by $500.00 of the amount then required to be made as child support."
The judgment gave Mrs. Cochran "final authority" in matters involving the health, education, and welfare of the children.
Mr. Cochran subsequently defaulted on child support and other payments required of him under the divorce judgment. Consequently, Judge Richard H. Dorrough entered arrearage judgments against him in September 2002 and in January 2003, in the amounts of $18,752.60 and $2,142.70, respectively.
Meanwhile, from February 2001 until at least August 2004, Mr. Cochran enjoyed access to the children in addition to the visitation specifically allowed by the settlement agreement. For example, he routinely kept the children for two hours after school every Tuesday and Thursday (hereinafter referred to as "the weekday visits"). By approximately August 2004, however, Mrs. Cochran was no longer consenting to the weekday visits, and, on April 28, 2005, Mr. Cochran filed a "petition for modification of custody or alternatively petition for modification of visitation." The petition sought an order awarding Mr. Cochran primary physical custody or, alternatively, at least one-half the custodial period. The petition also sought a "formal parenting plan" awarding Mr. Cochran the "final decision-making authority with regard to the children's education, emotional, and physical health issues, and extracurricular and sports activities."
On July 13, 2005, pursuant to a joint motion filed by the Cochrans, the trial court appointed Dr. Karl Kirkland as a "parenting coordinator" to assist the Cochrans in "making and implementing decisions... regarding visitation matters." On August 30, 2005, Mr. Cochran filed a motion to dismiss his petition for modification on the ground that the "best interests of the ... children [would be] served by... the parties' continuing participation in co-parenting counseling with Dr. Kirkland." The trial court granted that motion.
*1224 However, on September 26, 2006, Mr. Cochran filed a second "petition for modification," alleging that there had "been a material change in circumstances since the entry of the previous award of custody and visitation." He sought a reallocation of the "rights and responsibilities between the parties with regard to the parties' minor children to include more of a shared parenting time" and an order giving him "the final decision-making authority with regard to the children's education, emotional, and physical health issues, and extracurricular and sports activities." On February 23, 2007, Mr. Cochran filed a sworn amended petition for modification, seeking an order awarding him "true joint custody of the children and designat[ing him] as having final decision-making authority with regard to the children's medical care, their education, and their sports activities."
On August 16, 2007, after an ore tenus hearing, the trial court entered an order (hereinafter referred to as the "modification order") that, among other things, awarded the parties joint legal and physical custody and gave Mr. Cochran final decision-making authority as to the children's health care, education, and extracurricular activities, based on a finding of a material change in circumstances. The court's rationale related in large part to three matters that, according to Mr. Cochran, amounted to material changes in circumstances since the entry of the divorce judgment. One was that, from November 2004 to approximately November 2006, W.G. had been treated with the antidepressant drug Prozac. Although the treatment had ended by February 23, 2007, when Mr. Cochran filed his amended petition, he asserted that the course of treatment for W.G. evidenced, among other things, bad judgment on Mrs. Cochran's part. Second, he asserted that Mrs. Cochran had undermined his relationship with the children by terminating the weekday visits. Third, Mr. Cochran alleged that, because the children had grown older since the divorce, they needed to spend more time with him.
In the modification order, the trial court stated, in pertinent part:
"[Mr. Cochran] adamantly objected to learning that his older son, W.G., was prescribed Prozac at [Mrs. Cochran's] request. The circumstances of [Mrs. Cochran's] obtaining that prescription for Prozac for this child were murky at best. What was clear was that the child was not taken to a physician prior to the prescription being written. Testimony appeared to indicate that [Mrs. Cochran] simply called the child's doctor and requested a prescription for Prozac to cure W.G.'s behavior problems at school. [Mr. Cochran] objects to the children being placed on medication prior to exhausting other remedies for whatever the behavioral problem may be. He appeared gravely concerned that such action by [Mrs. Cochran] would occur again. [Mr. Cochran] further objects to [Mrs. Cochran's] continued exclusion of him from major decisions about the children. He believes that her decision to unilaterally allow W.G. to take Prozac and to continue that medication after the physician recommended stopping the medication, is not in the child's best interest and does not evidence sound judgment.
"The court believes circumstances have materially changed since the entry of the final decree of divorce such that the two young children would benefit from increased direct paternal guidance at this crucial stage in their lives. For example, the older child, W.G., was suspended for two days from school because he and other children wrote an inappropriate message at school. When *1225 W.G. further manifested his reluctance or refusal to comply with behavioral requirements of a child of his age, the result was the prescription for Prozac. There was testimony from several witnesses that both children are frequently belligerent toward [Mrs. Cochran] and that, on occasion, she has called [Mr. Cochran] to assist in controlling the behavior problems. There was testimony that the children had hit [Mrs. Cochran] on occasion and that they speak to her in a disrespectful manner.
"[Mrs. Cochran's] testimony confirmed that she believes that it is within her purview, as the physical custodian for the children, to determine whether or not the children should exercise visitation with their father. At some point after the divorce, the parties agreed that, in addition to scheduled visitation, [Mr. Cochran] would have visitation on Tuesdays and Thursdays each week. However, [Mrs. Cochran] only allowed him to pick up the children at about 4:00 p.m. and to return them to her home between 6:00 p.m. and 6:30 p.m. She unrealistically expected that the children would complete their homework and eat supper during this time. Upon returning the children to her home, [Mr. Cochran] testified that he was often greeted by a baby-sitter waiting to care for them because [Mrs. Cochran] was `out' for the evening.
"On or about August of 2004, [Mrs. Cochran] unilaterally stopped the weekday visitation. [Mr. Cochran] asserts that the cessation of visitation was because he refused to reimburse her for a fence she built at her home. [Mrs. Cochran] asserted that she stopped the visitation because [Mr. Cochran] was unable to fulfill the requirements of a father helping the children with elementary school homework. Given the level of intelligence and post-secondary education of these parties, [Mrs. Cochran's] rationale is nothing more than an attempt to disguise interference with [Mr. Cochran's] visitation and, therefore, his long-term relationship with his children."
In a separate order issued the same day (hereinafter referred to as the "co-parenting order"), the court vested in Dr. Kirkland the ultimate authority to, among other things, "chang[e] education, daycare, and/or extra-curricular activities for the children," and to "determin[e] appropriate medical, mental health and counseling treatment (including psychotherapy, domestic violence counseling and batterers' prevention programs, substance abuse treatment or counseling and parenting or co-parenting classes) for the parents and/or the children."
In the modification order, the court also declared void the arrearage judgments of 2002 and 2003. Specifically, as to the arrearage judgments, the order stated:
"That pursuant to the parties' original 2000 Settlement Agreement, [Mr. Cochran's] child support obligation was to be decreased by $500.00 per month for the month following the youngest child's enrollment in first grade or K-5 (September 2004). Said child support amount was never decreased and [Mr. Cochran] has continued to pay $500.00 over and above what was reflected by the agreement for some 36 months (September 2004-August 2007). Therefore, [Mr. Cochran] is due to receive a credit of $18,000 against any remaining amounts owed to [Mrs. Cochran]. It appears such a credit would more than satisfy the 2002 and 2003 judgments for monies owed to [Mrs. Cochran] for arrearages. (The court did not add the amounts of [Mr. Cochran's] payments since 2002 which were in excess of [Mr. Cochran's] monthly child support amount. It appears *1226 that such an undertaking would yield a large over-payment to be credited to [Mr. Cochran].) Therefore, as of the date of this order, all arrearages and judgments against [Mr. Cochran] are deemed fully satisfied and the judgments are void. Neither party shall owe the other any monies other than what is specifically addressed in this order and/or not specifically modified herein."
(Emphasis added.)
Mrs. Cochran appealed, requesting that the modification order and the co-parenting order be reversed in toto. Thereafter, all five judges on the Court of Civil Appeals recused themselves,[1] and the appeal was transferred to this Court, pursuant to Ala.Code 1975, § 12-3-15.

II. Standard of Review
The parties agree in this Courtas they did in the trial courtthat the applicable standard is the standard set forth in Ex parte McLendon, 455 So.2d 863 (Ala. 1984).
"In situations in which the parents have joint legal custody, but a previous judicial determination has granted primary physical custody to one parent, the other parent, in order to obtain a change in custody, must meet the burden set out in Ex parte McLendon. See Scholl v. Parsons, 655 So.2d 1060, 1062 (Ala.Civ. App.1995). The burden set out in McLendon requires the parent seeking a custody change to demonstrate that a material change in circumstances has occurred since the previous judgment, that the child's best interests will be materially promoted by a change of custody, and that the benefits of the change will more than offset the inherently disruptive effect resulting from the change in custody. Ex parte McLendon, 455 So.2d at 866."
Dean v. Dean, 998 So.2d 1060, 1064-65 (Ala.Civ.App.2008).
"A material change of circumstances occurs when important facts unknown at the time of the initial custody judgment arise that impact the welfare of the child. A custodial parent's change of environment that endangers the child's physical or emotional health, safety, or well-being constitutes a material change of circumstances." K.E.W. v. T.W.E., 990 So.2d 375, 380 (Ala.Civ.App.2007) (citation omitted). "The McLendon standard is a `rule of repose,' meant to minimize disruptive changes of custody because this Court presumes that stability is inherently more beneficial to a child than disruption." Ex parte Cleghorn, 993 So.2d 462, 468 (Ala. 2008).
"On appellate review of custody matters, [the appellate] court is limited when the evidence was presented ore tenus, and, in such circumstances, a trial court's determination will not be disturbed `absent an abuse of discretion or where it is shown to be plainly and palpably wrong.' Alexander v. Alexander, 625 So.2d 433, 434 (Ala.Civ.App.1993) (citing Benton v. Benton, [520 So.2d 534 (Ala.Civ.App. 1988)]). As the Alabama Supreme Court highlighted in [Ex parte] Patronas, [693 So.2d 473 (Ala.1997)], `"[T]he trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody."' Patronas, 693 So.2d at 474 (quoting Ex parte Bryowsky, 676 So.2d 1322, 1326 (Ala.1996)). Thus, appellate *1227 review of a judgment modifying custody when the evidence was presented ore tenus is limited to determining whether there was sufficient evidence to support the trial court's judgment. See Patronas, 693 So.2d at 475.
"`However, even under the ore tenus rule, "[w]here the conclusion of the trial court is so opposed to the weight of the evidence that the variable factor of witness demeanor could not reasonably substantiate it, then the conclusion is clearly erroneous and must be reversed."' B.J.N. v. P.D., 742 So.2d 1270, 1274 (Ala.Civ.App.1999) (quoting Jacoby v. Bell, 370 So.2d 278, 280 (Ala. 1979))."
Cheek v. Dyess, 1 So.3d 1025, 1029 (Ala. Civ.App.2007). Moreover, the ore tenus rule does not apply to a trial court's legal conclusions. Ex parte Cater, 772 So.2d 1117, 1119 (Ala.2000).

III. Discussion
Mrs. Cochran contends that the conclusions underpinning the modification order and the co-parenting order are legally and factually insufficient. In particular, she challenges the modification order inasmuch as it modified the custody arrangement set out in the judgment of divorce. She also argues that the modification order "erroneously voided vested arrearage and cost judgments previously awarded to [her] for [Mr. Cochran's] failure to abide by the final judgment of divorce." Mrs. Cochran's brief, at 67 (emphasis added).

A. Modification of the Custody Arrangement
As noted previously in this opinion, Mr. Cochran's arguments for modification of the custody arrangement principally involved the prescription for Prozac for the older son and Mrs. Cochran's alleged interference with Mr. Cochran's parental relationship with the children.

(1) The Prozac Prescription
The trial court concluded that Mrs. Cochran essentially commandeered a prescription for Prozac as a treatment for W.G. and that she did so precipitously. This conclusion is without factual support. Mrs. Cochran's first recourse for treatment of W.G. was Dr. JoAnne W. Ray, a licensed clinical psychologist. Dr. Ray was W.G.'s longtime therapist, having provided "therapeutic services" to W.G. soon after the couple's divorce in 2001 for "symptoms of mood disturbance and defiant behavior." At another time, Dr. Ray "performed [a] kindergarten evaluation" of W.G. in connection with his enrollment at a private school. In August 2004, Mrs. Cochran had again engaged the services of Dr. Ray for treatment of anxiety and moodiness that W.G. was experiencing. Indeed, Mr. Cochran had, several months earlier, recommended to Mrs. Cochran that she seek counseling for W.G. Both Mr. Cochran and Mrs. Cochran participated in W.G.'s sessions with Dr. Ray.
Those counseling sessions continued until mid-November 2004. By that time, Dr. Ray had become dissatisfied with the progress of the sessions, and, according to Mrs. Cochran, she recommended that W.G. "be evaluated by a psychiatrist for possible medication."[2] She gave Mrs. Cochran the names of the only two psychiatrists in Alabama whom she would recommend. However, Mrs. Cochran was unable to locate one of those doctors, and the other was not accepting any new patients. Mrs. Cochran then discussed Dr. Ray's recommendation with Dr. Catherine L. Wood, a pediatrician at Partners in Pediatrics (hereinafter referred to as "the Partners"), *1228 who had been one of the primary physicians for the children since birth. After that discussion and throughout the next two years, Dr. Wood, as well as her associate, Dr. Susan A. Brannon, another of the children's life-long primary physicians, prescribed Prozac for W.G. During that time, Mr. Cochran discussed the medication with Dr. Wood and Dr. Brannon. According to Mr. Cochran, he understood that the medication was to help the child "through a dark mood."
The only basis for the trial court's statement that Prozac was administered even "after the physician recommended stopping the medication" (emphasis added) appears to be an assertion in Mr. Cochran's amended petition to that effect with reference to Dr. Wood. However, Mr. Cochran presented no testimony from Dr. Wood or from any other physician concerning W.G.'s taking of Prozac. Moreover, in his own trial testimony, Mr. Cochran agreed that "Dr. Wood and Dr. Brannon prescribed the Prozac until some point in late ... November 2006." (Emphasis added.) The medication ceased in November 2006. In other words, the trial testimony directly refuted the allegation that Prozac was administered to W.G. after the prescribing physician recommended that it be stopped.
Neither does the record support the trial court's assertion that an incident at school precipitated the prescription for Prozac. W.G. was suspended from classes for two days because of an inappropriate message he had drawn. However, according to Mr. Cochran's brief, the incident at school occurred in December 2004. Mr. Cochran's brief, at 14. It is clear from the record that the Prozac treatment began the preceding month. Thus, although Mr. Cochran allegedly disapproved of the course of treatment prescribed by the Partners, it is apparent that the course of treatment was the culmination of a methodical, regular, and responsible process.

(2) The Weekday Visits
The trial court characterized Mrs. Cochran's decision to terminate the weekday visits as evidence of an attempt to undermine Mr. Cochran's authority with the children. In that connection, the trial court stated: "[Mrs. Cochran's] testimony confirmed that she believes that it is within her purview, as the physical custodian for the children, to determine whether or not the children should exercise visitation with their father." Mrs. Cochran arguesand we agreethat her "pro-active stance in allowing Tuesday-Thursday and other additional visitation was [improperly] used as a weapon against her." Mrs. Cochran's brief, at 56.
Mrs. Cochran was not legally obligated to continue the weekday visits, which merely supplemented, by mutual agreement, the visitation schedule set out in the divorce judgment. It is the policy of the courts to encourage amicable agreements between the parties in custody matters, because such agreements benefit all the parties, and the children in particular. Ex parte Couch, 521 So.2d 987, 990 (Ala. 1988). That policy would be frustrated if "agreed-upon changes to a custody arrangement [could] be considered to be relinquishment of a part[y's] rights under the previous custody judgment." Watters v. Watters, 918 So.2d 913, 917 (Ala.Civ. App.2005).
At any rate, modification of custody is not the proper remedy for a visitation dispute. Foster v. Carden, 515 So.2d 1258, 1260 (Ala.Civ.App.1987); Smith v. Smith, 464 So.2d 97, 100 (Ala.Civ.App. 1984). "Rather, the appropriate remedy in such a situation is to punish the custodial parent for contempt, not to uproot the *1229 children." Lami v. Lami, 564 So.2d 969, 970 (Ala.Civ.App.1989).
Mr. Cochran relies on Fricks v. Wood, 807 So.2d 561 (Ala.Civ.App.2001), in which the Court of Civil Appeals affirmed a judgment modifying custody in favor of the non-custodial parent on the ground that "the mother had deliberately obstructed the father's relationship with the child." 807 So.2d at 564. Mrs. Cochran contends that Fricks is easily distinguishable from this case, and we agree. In Fricks, the following factors were determinative:
"The mother admitted that on numerous occasions, she had denied the father his scheduled visitation because she was confused or had made a mistake in interpreting the parties' divorce judgment; that she had prevented the father from picking the child up from his preschool program .... She admitted that she had purposely omitted the father's name and his contact information from all of the child's school enrollment forms, and that she had listed her new husband as the child's father."
807 So.2d at 563-64 (emphasis added). Additionally, she "did not even list the father as a person approved to pick up the child from school." Id. at 562-63.
In this case, there are no allegations that Mrs. Cochran has violated the visitation schedule set out in the divorce judgment so that she would be subject to contempt proceedings. There is no authority in the settlement agreementor anywhere else of which this Court is awarefor the proposition that a parent who has primary physical custody may not engage the services of someone other than the former spouse as an occasional babysitter.
Mr. Cochran concedes that he has always had complete access to the children's school and medical records. Unlike the mother in Fricks, Mrs. Cochran made no attempt to hide the identity of the children's father or to isolate Mr. Cochran from the personnel at the children's school or from the school itself. Also, according to Mr. Cochran, he "had a lot of access to the boys along with the structured two-hour visits on Tuesdays and Thursdays." (Emphasis added.) Mr. Cochran coaches a number of sports activities in which his children regularly participate. In that connection, he often drives the children to and from the sports events. At trial, he stated: "I have still a lot of access to the boys. It's access during their sporting events. ... They are practicing football or practicing basketball during the time that I am with them." (Emphasis added.) Fricks does not aid Mr. Cochran.
An issue involved in the termination of the weekday visits was homework. However, it was Mrs. Cochran's position that the weekday visits were interfering with the children's ability to complete their homework within, in the words of Dr. Kirkland, "the rigorous homework and structured schedule requirements associated with private school in Montgomery."[3] There was never any allegation, as the trial court suggested, that Mr. Cochran was incapable of doing elementary-school homework. There was no evidence to support Mr. Cochran's contention, or the trial court's conclusion, that in terminating the weekday visits Mrs. Cochran was attempting to undermine his relationship with the children.
Finally, the mere passage of time is not a basis for a modification of custody. Nichols v. Nichols, 516 P.2d 732, 734 n. 3 (Alaska 1973). "`The fact that the children have grown older in and of itself is no sufficient change of condition to warrant a change in custody.'" Engler v. *1230 Engler, 455 S.W.2d 36, 41 (Mo.Ct.App. 1970) (quoting Fordyce v. Fordyce, 242 S.W.2d 307, 314 (Mo.Ct.App.1951)). The natural aging process is a "contingency to be normally expected and ... is one which it is to be presumed the trial court took into consideration in making the original decree in the infancy of the children." Fordyce, 242 S.W.2d at 314. Moreover, it is disingenuous to suggest that any alleged "belligeren[ce]" of the children toward Mrs. Cochran constitutes a ground for modifying the custody arrangement in favor of Mr. Cochran. See Pullum v. Webb, 669 So.2d 925, 927 (Ala.Civ.App.1995) ("erosion of the relationship between the [custodial parent] and the children is insufficient to support a change in custody").
For these reasons, we conclude that Mr. Cochran has not met his burden of showing "that a material change in circumstances has occurred since the previous judgment." Dean, 998 So.2d at 1065. Because as to custody the modification order is without legal and factual support, it cannot be sustained. As to the custody issue, it is, therefore, reversed. Likewise, the co-parenting order, which is a product of the erroneous modification order, is also reversed.

B. Credit on the Arrearage Judgments
Mrs. Cochran next contends that the trial court misconstrued paragraph 8(d) of the settlement agreement by erroneously concluding that the $500 child-care provision terminated in September 2004, the month after S.S. began first grade, and she argued that the trial court lacked the power to void the arrearage judgments of 2002 and 2003. Because we agree that the trial court was without jurisdiction to void the arrearage judgments, we do not decide whether it correctly identified the terminus ad quem of the child-care provision.
"It is well settled that child support payments become final judgments on the day they are due and may be collected as any other judgment is collected; and that payments that mature or become due before the filing of a petition to modify are not modifiable. See State ex rel. Howard v. Howard, 671 So.2d 83 (Ala.Civ.App.1995); Cunningham v. Cunningham, 641 So.2d 807 (Ala.Civ. App.1994); Glenn v. Glenn, 626 So.2d 638 (Ala.Civ.App.1993); Frasemer v. Frasemer, 578 So.2d 1346 (Ala.Civ.App. 1991); Barnes v. State ex rel. State of Virginia, 558 So.2d 948 (Ala.Civ.App. 1990); Endress v. Jones, 534 So.2d 307 (Ala.Civ.App.1988). Furthermore, it is well settled that a trial court has no power to forgive an accrued arrearage. See, State ex rel. McDaniel v. Miller, 659 So.2d 640 (Ala.Civ.App.1995); Hardy v. Hardy, 600 So.2d 1013 (Ala.Civ. App.1992), cert. denied, Ex parte Hardy, 600 So.2d 1016 (Ala.1992). Although the trial court has the discretion to give the obligated parent credit for money and gifts given to the child or for amounts expended while the child lived with the obligated parent or a third party, it may not discharge child support payments once they have matured and come due under the divorce judgment."
Ex parte State ex rel. Lamon, 702 So.2d 449, 450-51 (Ala.1997) (emphasis added). See also McIlwain v. Atchison, 571 So.2d 1181, 1182 (Ala.Civ.App.1990) (distinguishing Keller v. Keller, 370 So.2d 306 (Ala.Civ. App.1979), and holding that "the trial court... lacked the authority" to allow "the father credit against a [1986] arrearage judgment for sums paid by the father to support and maintain the child for periods of time [from 1986 to 1989] when the child did not reside with the mother"). Thus, to the extent that the modification order deemed the arrearage judgments "fully *1231 satisfied" and "void," the order is reversed.[4]

IV. Conclusion
In conclusion, the modification order is reversed in toto, and the co-parenting order is likewise reversed. This case is remanded for the entry of an order or orders consistent with this opinion.
REVERSED AND REMANDED.
LYONS and BOLIN, JJ., concur.
PARKER, J., concurs in the result.
SEE and MURDOCK, JJ., concur in the judgment of reversal, but dissent as to the rationale and the instructions on remand.
COBB, C.J., and STUART, J., recuse themselves.
MURDOCK, Justice (concurring in the judgment of reversal, but dissenting as to the rationale and the instructions on remand).
Because of the presumptions attendant to the ore tenus rule, as well as for other reasons hereinafter stated (including my disagreement with certain statements of law in the main opinion), I respectfully dissent from the conclusions in the main opinion and the instructions on remand.

I. The Modification of Legal Custody
The 2001 divorce judgment awarded the parties "joint legal custody" of their two sons. See Ala.Code 1975, § 30-3-151(2) (defining joint legal custody). The 2001 divorce judgment also gave Mrs. Cochran "final authority" concerning "major decisions" for the children. See Ala.Code 1975, § 30-3-153(a)(6)(within the context of a joint-legal-custody arrangement, discussing the designation of one parent who will have "primary authority and responsibility" for certain decisions "if the parents are unable to agree").[5]
In his modification petition, Mr. Cochran specifically requested that the trial court enter an order awarding him final decision-making authority for purposes of legal custody, in addition to asking the trial court to modify the prior physical-custody award. The trial court's August 2007 modification order continued the joint-legal-custody arrangement that had been put in place by the 2001 divorce judgment. The only modification made by the trial court to this joint-legal-custody arrangement was to award Mr. Cochran the "final decision-making authority" for the children on three issues: "medical/health care, education, [and] extra-curricular activities." The main opinion's reversal of the trial court's order "in toto," results in the reversal of this modification to the parties' joint-legal-custody arrangement.
I disagree with reversal of the trial court's modification of the joint-legal-custody arrangement for two reasons. First, Mrs. Cochran's briefs to this Court contain *1232 no argument that the trial court's modification of legal custody was in error. "`An argument not made on appeal is abandoned or waived.'" Muhammad v. Ford, 986 So.2d 1158, 1165 (Ala.2007) (quoting Avis Rent A Car Sys., Inc. v. Heilman, 876 So.2d 1111, 1124 n. 8 (Ala. 2003)); see also Rule 28(a)(10), Ala. R.App. P.
Second, even if Mrs. Cochran had made such an argument to this Court, the trial court's order retaining, but modifying, the parties' joint legal custody of the children clearly is due to be affirmed based on (a) the proper application of the ore tenus rule to the evidence before the trial court and (b) the application of the appropriate standard for modification of legal custody. As to the evidence before the trial court upon which the ore tenus presumption operates in support of the modification, I refer the reader to the discussion in Part II below. As to the standard against which that evidence is to be measured, I note that the standard discussed in Ex parte McLendon, 455 So.2d 863 (Ala.1984), "does not apply to the modification of legal custody." West v. Rambo, 786 So.2d 1138, 1141 (Ala.Civ. App.2000). "`To modify legal custody, the trial court need only find that the best interests of the child are served by the modification.'" Id. (emphasis added) (quoting Harris v. Harris, 775 So.2d 213, 215 (Ala.Civ.App.1999)).
Referring to the parties' respective briefs to this Court, the main opinion states that "[t]he parties agree ... that the applicable standard is the standard set forth in Ex parte McLendon." 5 So.3d at 1226. As noted, however, the argument of Mrs. Cochran, as the appellant in this Court, is directed only to the issue of modification of physical custody. Mr. Cochran's brief responds to this argument. As the prevailing party in the trial court, he is under no obligation to discuss the standard applicable to modification of legal custody when that issue is not discussed in the appellant's brief.

II. The Modification of Physical Custody
The trial court's order modified physical custody of the children from being primary physical custody in Mrs. Cochran to being an equal, joint physical custody in both parents.[6] Pursuant to Ex parte McLendon, this order is due to be affirmed if the record contains substantial evidence in support of two distinct elements: (1) a material change in circumstances has occurred during the six years since the entry of the 2001 divorce judgment and (2) a change from primary physical custody in Mrs. Cochran to the "joint physical custody" specifically ordered by the trial court in this case would "materially promote"[7] *1233 the children's best interests. 455 So.2d at 866.
On appeal, Mrs. Cochran argues that "the evidence in the record simply does not support the conclusion that a material change in circumstances has occurred or that a change of custody would materially promote the children's best interests and welfare." Specifically, Mrs. Cochran's argument focuses on four points:
"The trial court erroneously found that the following factors constituted a material change in circumstances and warranted a modification in custody in this case:
"(1) that [Mrs. Cochran] had attempted to interfere with [Mr. Cochran's] relationship with the children by stopping the Tuesday-Thursday visits in 2004 and by allegedly making certain statements to the parties' children;
"(2) that [Mrs. Cochran] had allowed the children to spend time with her 'boyfriends' rather than with [Mr. Cochran];
"(3) that [Mrs. Cochran] had shown poor judgment in giving the oldest child antidepressant medication in 2004; and
"(4) that the children were older now and, therefore, their needs had changed."
This argument by Mrs. Cochran is a truncation of the bases laid out by the trial court in its 19-page order. To some degree, Mrs. Cochran's argument also reflects a presentation of the evidence in the light most favorable to her, rather than Mr. Cochran, as required by the presumption in favor of the trial court's findings accorded by the ore tenus rule.
"`Neither the Court of Civil Appeals nor this Court is allowed to reweigh the evidence in this case. This case, like all disputed custody cases, turns on the trial court's perception of the evidence. The trial court is in the better position to evaluate the credibility of the witnesses... and the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody.'"
Ex parte Patronas, 693 So.2d 473, 475 (Ala.1997)(quoting Ex parte Bryowsky, 676 So.2d 1322, 1326 (Ala.1996)); see also Transamerica Commercial Fin. Corp. v. AmSouth Bank, 608 So.2d 375, 378 (Ala. 1992).
Also, because of substantial conflicts between the testimony of Mrs. Cochran, the testimony of Mr. Cochran, and the testimony of the children's paternal grandmother, this Court must conclude that the trial court rejected some, if not all, of Mrs. Cochran's testimony. "It is axiomatic that *1234 it is the [fact-finder's] province to resolve conflicts in testimony ... and to judge the credibility of witnesses.... [A fact-finder] concluding that any witness was willfully not truthful about one material aspect of his or her testimony is free to disregard all or any part of the testimony." Flint Constr. Co. v. Hall, 904 So.2d 236, 250 (Ala.2004) (citations omitted).
The trial court's 19-page order contains numerous findings of fact in addition to those upon which Mrs. Cochran would focus our attention. The trial court's order states that it was "[b]ased on [the court's findings], together with a review of the records, the exhibits, the testimony and demeanor of the parties." As Mr. Cochran's brief to this Court correctly notes, Mrs. Cochran
"argues that the trial court's award of custody to [Mr. Cochran] was in error based on four individual arguments.... Her arguments neglect the fact that the trial court's rationale and findings took into consideration a compilation of all of the issues and facts presented, rather than merely looking at or relying on one single issue or fact as it applies to McLendon.

"The Court of Civil Appeals has formerly held that a trial court should take into consideration all relevant evidence when making a determination as it relates to a change in custody to the non-custodial parent....
"....
"... As in Steward v. Steward, 464 So.2d 525 (Ala.Civ.App.1985), while one factor alone may be insufficient to justify a change of custody, when all of the factors presented as evidence by the party seeking the change are considered, the change in custody is warranted. Steward, supra, at 527. In all respects [Mr. Cochran] ... put before the trial court ample evidence of ... numerous factors which directly affected the children negatively and ample evidence of how the change of custody to an equal sharing of the children's time would materially promote the children's best interests, thereby meeting his burden."
(Emphasis added.)
In addition to addressing the four factual issues raised by Mrs. Cochran, Mr. Cochran (1) argues generally that the trial court's order was based on "a compilation of all of the issues and facts presented," and (2) directs this Court to other specific factual matters that support the trial court's order. For example, Mr. Cochran notes in his brief to this Court that the present case did not involve a "visitation dispute alone," but that the visitation issue was simply one part of the evidence supporting the conclusion that Mrs. Cochran was attempting to damage his relationship with the children; that the trial court received evidence "involving [Mrs. Cochran's] own physical and mental health and the correlation between such [matters] and the physical and emotional well-being of the minor children";[8] that Mrs. Cochran had been unable to move past her anger toward Mr. Cochran in the six years since the entry of the divorce judgment and repeatedly had inserted the children into her conflicts with Mr. Cochran even after she had been informed that doing so was detrimental to the children (the trial court *1235 could have concluded that Mrs. Cochran engaged in such behavior as recently as one week before the April 2007 hearing);[9] and that the children had become verbally and physically belligerent with Mrs. Cochran and she was unable to properly cope with their belligerence.[10]
Responding to Mrs. Cochran's line of argument, the main opinion states (1) that "the mere passage of time is not a basis *1236 for a modification of custody," 5 So.3d at 1226, (2) that "it is disingenuous to suggest that any alleged `belligeren[ce]' of the children toward Mrs. Cochran constitutes a ground for modifying the custody arrangement in favor of Mr. Cochran," 5 So.3d at 1230, and (3) that Mrs. Cochran's satisfaction of her legal obligations as to Mr. Cochran's visitation immunizes her from a contention that her decisions as to additional visitation reflect the pursuit of a personal agenda rather than the pursuit of the children's best interests.[11] The main opinion concludes:
"Mr. Cochran has not met his burden of showing `that a material change in circumstances has occurred since the previous judgment.' Dean [v. Dean, 998 So.2d 1060, 1065 (Ala.Civ.App.2008)]. Because as to custody the modification order is without legal and factual support, it cannot be sustained."
5 So.3d at 1230.
I respectfully disagree with the three propositions of law described above, or at least with the manner in which they are utilized in this case. Also, though I agree that some of the specific findings of fact made by the trial court are erroneous or are attributed to the wrong witness,[12] other significant findings of fact made by the trial court in support of its order are amply supported by the record. Based on the record before us, and particularly the testimony of Mr. Cochran, the paternal grandmother, and Dr. Kirkland, I do not believe this Court can conclude (1) that, as a matter of law, Mr. Cochran has failed to meet his burden of showing a material change of circumstances or (2) that, as a *1237 matter of law, the specific change of physical custody ordered by the trial courti.e., equal, joint physical custodywould not materially promote the children's best interests.[13]
First, as to the consideration of the children's ages, when the 2001 divorce judgment was entered, the parties' sons were approximately three years old and five years old. Mr. Cochran testified that the reason he agreed during the divorce proceedings for Mrs. Cochran to have physical custody of the children was because "[t]hey were young [and] ... [w]e felt it was in their best interest to minimize the effects of the divorce on them by continuing to let them live the majority of the time in her house." He stated that he believed Mrs. Cochran was "very capable" of taking care of the children "at that time."
When the trial court entered the August 2007 order, the children were approximately 9 years old and 11 and 1/2 years old. Mrs. Cochran argues that
"[n]ormal development of a child does not, per se, justify a custody modification. In Ex parte Devine, 398 So.2d 686 (Ala.1981), this Court abolished the `tender years' doctrine which created a legal presumption that young children should be placed in their mother's custody. The age of children is now simply one of many factors to consider. Sockwell v. Sockwell, 822 So.2d 1219 (Ala.Civ.App. 2001). The trial court's bold assumption, that because the children are older, they should spend half their time with [Mr. Cochran], echoes the stereotypical thinking condemned by this Court in Devine. The age of the children provides no basis for the trial court's change of custody."
(Emphasis added.[14])
In response to Mrs. Cochran's argument, the main opinion states that "the *1238 mere passage of time is not a basis for a modification of custody." 5 So.3d at 1229. It cites dicta from an Alaska case, Nichols v. Nichols, 516 P.2d 732, 734 n. 3 (Alaska 1973), in support of this statement. The fuller context for the dicta in Nichols, however, is as follows: "The passage of time as it affects the relationships of parties may bear relevance to a change of custody. Mere passage of time, however, is not of itself a change in circumstances sufficient to support modification." Id. (emphasis added).
I respectfully submit that the trial transcript and the trial court's order clearly demonstrate that the trial court's modification of custody was not based solely, or even primarily, on "the mere passage of time." Mr. Cochran did not argue, and the trial court did not conclude, that the bare fact that the children's ages had changed, with no other evidence as to their development or their relationships with Mrs. Cochran and Mr. Cochran, would support a modification of custody in the present case. To the contrary, the full record in this case and the trial court's extensive findings of fact reflect that the children's having grown olderand having grown and changed in their relationships with both Mr. Cochran and Mrs. Cochransupported the conclusion that a material change in circumstances had occurred in the present case.[15]
*1239 Also, even assuming, as Mrs. Cochran argues, that the "[n]ormal development of a child does not, per se, justify a custody modification," this argument begs the question whether the evidence before the trial court reflected the "[n]ormal development of a child" between the entry of the 2001 divorce judgment and the trial in the present case. I cannot conclude that, as a matter of law, the trial court could not determine as a factual matter that "normal" development is not reflected in a young child who is described as "confused and struggling" on occasion, who has been placed on the antidepressant Prozac because of depression, who has been suspended from school for inappropriate behavior, and who, along with his sibling (i.e., the other child),
"ha[s] been belligerent toward [Mrs. Cochran]. As far asshe would come to pick them up at [the paternal grandmother's] house. They would hit on her. They would, especially [the younger child], ram her in the stomach with his head, and he would yell and scream that he hated her. And this has been going on for years, not just one or two occasions."[16]
Second, as to the main opinion's conclusion that "it is disingenuous to suggest that any alleged `belligeren[ce]' of the children toward Mrs. Cochran constitutes a ground for modifying the custody arrangement in favor of Mr. Cochran," 5 So.3d at 1230, I do not find it disingenuous for the trial court to make a factual determination that a child's welfare might be at issue when the children hit Mrs. Cochran and scream at her in the presence of another person, much less in the privacy of the home, yet apparently do not exhibit that same behavior when they are in Mr. Cochran's custody. More importantly, could the trial court not decide as a factual matter that this behavior reflects a change in circumstances where there is no evidence indicating that the children behaved in that manner before the parties' divorce, but there is evidence indicating that the behavior first occurred and gradually grew *1240 worse after the divorce? Are we to assume that the trial court "presumed" such behavior would occur when it awarded Mrs. Cochran custody? Does such behavior not reflect a material change as to a parent's ability to meet a child's "emotional, social, moral, ... and educational needs," or as to "the respective home environments offered by the parties," or as to "the interpersonal relationship between [the] child and each parent"? Ex parte Devine, 398 So.2d 686, 696-97 (Ala.1981). I believe the trial court reasonably could have found that it does.[17]
Also, I note that the main opinion cites Pullum v. Webb, 669 So.2d 925, 927 (Ala. Civ.App.1995), in support of its conclusion that the children's belligerence toward Mrs. Cochran cannot, as a matter of law, constitute a ground for modifying custody. In this respect, I believe the main opinion places too much reliance on Pullum.
In Pullum, the Court of Civil Appeals reversed the trial court's judgment modifying custody because the trial court had applied the "best interest" standard rather than the standard announced in Ex parte McLendon. Pullum, 669 So.2d at 927. Ultimately, the court remanded the case, stating: "[T]he trial court should consider all relevant evidence to determine whether the father has met his burden by showing that the change of custody would materially promote the children's best interest and that the benefits of the change would outweigh the disruptive effect of a change of custody." Id. It was in the context of a discussion of the proper application of the second prong of the McLendon standard ("material promotion") that the Pullum court stated:
"In the present case, the trial court's order modifying custody stated, in pertinent part, that `the standard required and which should be applied is the best interest of the children. The [trial] court does not find that it would be in the best interest of the two children, ages 17 and 14[,] to be forced to live with their mother with the relationship being so strained.' Thus, it appears that the trial court erroneously applied the `best interest' standard. Additionally, a mere change in circumstances such as the erosion of the relationship between the mother and the children is insufficient to support a change in custody. King [v. King, 636 So.2d 1249,] 1253 [(Ala.Civ.App.1994)]; Clayton v. Clayton, 598 So.2d 929 (Ala.Civ.App.1992). The failure of the trial court to apply the appropriate standard is reversible error. Clayton, supra, at 931."
669 So.2d at 927. The two cases cited by the Pullum court in this discussion, King v. King, 636 So.2d 1249 (Ala.Civ.App.1994), and Clayton v. Clayton, 598 So.2d 929 (Ala.Civ.App.1992), also focus upon the second prong of the McLendon standard.
Further, whether a particular change is material is a fact-dependent inquiry. The facts at issue in Pullum were testimony from the noncustodial parent and the teenage daughter that "the [teenage] children did not get along with their mother anymore, and that both children preferred to live with their father." 669 So.2d at 927. Such generic facts involving a teenager are a far cry from the specific evidence involving the minor children that was before the trial court in the present case.
*1241 Based on the foregoing, I conclude that Pullum provides little if any support for the view expressed in the main opinion.
Third, the main opinion states:
"Mrs. Cochran arguesand we agree that her `pro-active stance in allowing Tuesday-Thursday and other additional visitation was [improperly] used as a weapon against her.' ...
"Mrs. Cochran was not legally obligated to continue the weekday visits, which merely supplemented, by mutual agreement, the visitation schedule set out in the divorce judgment. It is the policy of the courts to encourage amicable agreements between the parties in custody matters, because such agreements benefit all the parties, and the children in particular. Ex parte Couch, 521 So.2d 987, 990 (Ala.1988). That policy would be frustrated if `agreed-upon changes to a custody arrangement [could] be considered to be relinquishment of a part[y's] rights under the previous custody judgment.' Watters v. Watters, 918 So.2d 913, 917 (Ala.Civ.App.2005).
"At any rate, modification of custody is not the proper remedy for a visitation dispute."
5 So.3d at 1228 (emphasis omitted).
The parties' settlement agreement, which was incorporated into the 2001 divorce judgment, awarded Mr. Cochran "reasonable visitation rights ... as set forth [there]in," including: visitation every other weekend, visitation for two weeks during the summer, some visitation on holidays and the children's birthdays, and "[a]ny other times mutually agreed upon by the parties." In the last regard, the parties' agreement provided that "[t]he visitation schedule set forth herein may be changed by mutual agreement of the parties. The parties agree to work together and cooperate for the benefit of the children on any necessary changes to the visitation schedule."
In April 2005, Mr. Cochran filed a petition requesting a modification of custody or, in the alternative, a modification of his visitation rights. In its August 2007 order, the trial court noted:
"The parties voluntarily agreed to dismiss the [father's April 2005] petition in favor of working with Dr. Karl Kirkland toward a resolution of the issues. Those issues concerned [Mrs. Cochran's] control/limitation of [Mr. Cochran's] visitation dates and times and her unwillingness or inflexibility in allowing [Mr. Cochran] reasonable visitation with the two children. The parties engaged in counseling sessions with Dr. Kirkland for a period of about six months. Ultimately, there was little, if any, resolution to the visitation issues."
The trial court also stated:
"On or about August of 2004, [Mrs. Cochran] unilaterally stopped the weekday visitation. [Mr. Cochran] asserts that the cessation of visitation was because he refused to reimburse her for a fence she built at her home. [Mrs. Cochran] asserted that she stopped the visitation because [Mr. Cochran] was unable to fulfill the requirements of a father helping the children with elementary school homework. Given the level of intelligence and postsecondary education of these parties, [Mrs. Cochran's] rationale is nothing more than an attempt to disguise interference with [Mr. Cochran's] visitation and, therefore, his long-term relationship with his children."
Mrs. Cochran testified that Mr. Cochran failed to ensure that the children completed their homework on certain occasions during his Tuesday-Thursday visitation and that she stopped that visitation for that reason. The trial court rejected her *1242 testimony in that regard. Further, based on Mr. Cochran's testimony as to the cessation of his additional visitation and other testimony from Mrs. Cochran that the trial court could have considered in drawing an inference as to the true reasons for Mrs. Cochran's actions, I cannot conclude that the record does not provide an adequate basis, in the context of the ore tenus rule, for the trial court's finding that Mrs. Cochran's "rationale is nothing more than an attempt to disguise interference with the [Mr. Cochran's] visitation and, therefore, his long-term relationship with his children."
Also, I note that, in part, the main opinion couches its criticism of the trial court's judgment in terms of what Mrs. Cochran's legal obligations were as to Mr. Cochran's visitation and in terms of concern about cooperation between parents as to custodial and visitation issues being used to argue that there has been a relinquishment of the primary custodian's rights. I share the latter general concern. Mr. Cochran, however, did not argue that Mrs. Cochran relinquished anything when she allowed him additional visitation with the children, and the trial court did not make a finding to that effect. Instead, Mr. Cochran's argument, and the trial court's findings, concern the harmful motivations and effects of Mrs. Cochran's stances on visitation.
I respectfully submit that to the extent Mrs. Cochran was initially awarded primary physical custody of her children based on the assumption that she would put her personal interests aside and pursue the best interest of the children in regard to their visitation with Mr. Cochran, a pattern of behavior resulting from a desire to harm Mr. Cochran's relationship with the children could at least contribute to a finding of a material change of circumstances. Also, such behavior, along with other factors, might contribute to a totality of circumstances sufficient to satisfy the second prong of McLendon.[18]
In Lewis v. Lewis, 958 So.2d 896 (Ala. Civ.App.2006), the Court of Civil Appeals addressed a case similar in many respects to the one now before us:
"The trial court found that there had been a material change in circumstances since the entry of the March 2002 modification order and `that the benefits accruing to the children from such a change [of custody] would outweigh any disruptive effect.' We have reviewed the record and conclude that there is evidence to support the trial court's determination. Although the parties have not experienced what could be considered major life changese.g., changing jobs, moving to a different town, remarriage, health problems, etc.since the divorce, the trial court could have concluded that the cumulative effect of the events and behaviors that the trial court found to have occurred was sufficient to constitute a material change in circumstances and to warrant a change of custody....
"....
"Finally, the trial court reasonably could have concluded that the disruptive effect of a change of custody was not great. From the time of the divorce until the trial court's judgment, the father and the mother lived in the same community. The father exercised his visitation rights and was actively involved in the children's lives. Further, the children will continue to attend the *1243 same school and participate in the same activities regardless of which parent has primary custody."
958 So.2d at 900-01.
I believe the totality of the circumstances, viewed in light most favorable to Mr. Cochran, as it must be under the presumptions attendant to the ore tenus rule, provides sufficient support for the trial court's conclusion that the benefit to the children of the shift in this case to joint physical custody between two parents who have both been integrally involved in their children's lives would more than offset the disruption that these children would experience from such a change.[19]

III. Mr. Cochran's Credit Against His Child-Support Arrearage
The trial court stated as follows in allowing Mr. Cochran a credit against the child-support-arrearage judgments:
"[Mr. Cochran] pays child support in the amount of $2,973.21 each month. However, based on Paragraph [8(d)] of the Final Decree of Divorce, [Mr. Cochran's] child support should have been reduced to $2,400 in September of 2004. [Mrs. Cochran] argues semantics in asserting that the $500 difference should remain as child support. The Court believes that the Final Decree unambiguously states that the additional $500 was to end when [S.S.] (the younger child) entered the first grade in 2004. Child support should have been reduced to $2,400 at that time, and it was not. [Mr. Cochran] is due a credit for all monies overpaid since September 2004."
(Emphasis added.) As discussed in the main opinion, the judgment continues:
"That pursuant to the parties' original 2000 Settlement Agreement, [Mr. Cochran's] child support obligation was to be decreased by $500.00 per month for the month following the youngest child's enrollment in first grade or K-5 (September 2004). Said child support amount was never decreased and [Mr. Cochran] has continued to pay $500.00 over and above what was reflected by the agreement for some 36 months (September 2004-August 2007). Therefore, [Mr. Cochran] is due to receive a credit of $18,000 against any remaining amounts owed to [Mrs. Cochran]. It appears such a credit would more than satisfy the 2002 and 2003 judgments for monies owed to [Mrs. Cochran] for arrearages. (The Court did not add the amounts of [Mr. Cochran's] payments since 2002 which were in excess of [Mr. Cochran's] monthly child support amount. It appears that such an undertaking would yield a large over-payment to be credited to [Mr. Cochran].) Therefore, as of the date of this Order, all arrearages and judgments against [Mr. Cochran] are deemed fully satisfied and the judgments are void. Neither party shall owe the other any monies other than what is specifically addressed in this Order and/or not specifically modified herein."
(Emphasis added.)
Paragraph 8(d) of the parties' settlement agreement, as incorporated into the 2001 divorce judgment, provided that
"[f]or the month following the month during which the youngest minor child begins first grade (or K-5 if such K-5 program is a full day program) and is no longer in need of childcare services, [Mr. Cochran's] child support payments shall *1244 be reduced by $500.00 of the amount then required to be made as child support."[20]
As to whether the trial court erred by awarding Mr. Cochran a credit against the arrearage judgments, Mrs. Cochran first argues that the trial court erred in providing relief "never requested by [Mr. Cochran's] pleadings" and in deciding "issues which were not tried by implied or express consent." Second, Mrs. Cochran argues that the trial court erred when it awarded Mr. Cochran a credit because, she argues, the language of paragraph 8(d) was unambiguous and the parties' younger child continued to need "child care" after he entered the first grade. Third, Mrs. Cochran argues that even if a credit were due Mr. Cochran, the amount of his alleged overpayment does not exceed the arrearage judgments, particularly after taking into account postjudgment interest.
The main opinion pretermits discussion of these three issues by first taking up the issue whether the trial court had "jurisdiction" to "void" the arrearage judgments. I disagree with the main opinion's interpretation of the trial court's order.
"`Separate provisions of judgments, like provisions of contracts, should be construed in pari materia, and the entire judgmentall provisions considered should be read as a whole in the light of all the circumstances, as well as of the conduct of the parties. ... Further, if the terms of a judgment are not ambiguous, they should be given their usual and ordinary meaning.'"
Ex parte Snider, 929 So.2d 447, 456-57 (Ala.2005) (quoting Moore v. Graham, 590 So.2d 293, 295 (Ala.Civ.App.1991)). Further,
"`where there is a choice between a valid construction and an invalid construction the court has a duty to accept the construction that will uphold, rather than destroy, the contract.' Homes of Legend, Inc. v. McCollough, 776 So.2d 741, 746 (Ala.2000). See also Clark v. Board of Dental Exam'rs of Georgia, 240 Ga. 289, 294, 240 S.E.2d 250, 254 (1977) (`"When a judgment is susceptible of two meanings, one of which would render it illegal and the other proper, that construction will, if reasonably possible, be given it that would render it legal."' (quoting Byrd v. Goodman, 195 Ga. 621, 25 S.E.2d 34 (1943)))."
929 So.2d at 457.
Construing the trial court's order to have used the term "void" in a literal sense would, as the main opinion concludes, make the trial court's order erroneous. In fact, it would make the trial court's order nonsensical. If the trial court meant that the arrearage judgments were void so that they had no legal effect whatsoever, it would have been illogical for that court also to have talked in terms of awarding a "credit" against those judgments. The issue whether Mr. Cochran had paid a sufficient amount to "satisfy the judgments" would not even need to be discussed. I therefore believe we should look to see if the trial court's order is reasonably susceptible to an interpretation that is reasonable, that would allow us to "uphold that judgment rather than destroy" it, and that would construe the various phrases at issue "in pari materia" and "as a whole in the light of all the circumstances." Ex parte Snider, 929 So.2d at 457.
An entirely reasonable interpretation of the trial court's order readily presents itself. Assuming (as the trial court apparently *1245 believed) that the overpayments made by Mr. Cochran exceeded the amount of the arrearage judgments, those payments operated to deprive the arrearage judgments of any continuing, enforceable, legal effect. It is in that sense that I believe the trial court used (or misused) the term "void." This understanding is especially bolstered by the above-stated rule requiring provisions of a judgment to be read "in pari materia" and by the fact that the trial court, in the very same sentence, explained that it considered the judgments to have been "satisfied" by the excess child-support payments made by Mr. Cochran between September 2004 and September 2007.
With that said, whether to credit overpayments against an existing arrearage is a matter of equity. Numerous jurisdictions allow such credits, particularly where doing so will not result in an undue hardship to the children and/or to the parent to whom the payments are due to be made.[21]E.g., Young v. Williams, 583 P.2d 201, 203 (Alaska 1978) (recognizing that the general rule is that "`special considerations of an equitable nature may justify a court in crediting [voluntary payments made to the children] on his [arrearage] indebtedness to the plaintiff when that can be done without injustice to the plaintiff wife.'" (emphasis added) (quoting Briggs v. Briggs, 178 Or. 193, 204, 165 P.2d 772, 777 (1946))); see also In re Marriage of Rogers, 283 Ill.App.3d 719, 721-22, 219 Ill.Dec. 266, 670 N.E.2d 1154, 1156 (1996) ("The rationale supporting the rule [against allowing a credit] is that such a credit would amount to a unilateral modification of the dissolution judgment and could result in the deprivation of future support benefits.... Exceptions to the rule have been recognized where the equities of the circumstances so demand and where allowing the credit will not work a hardship." (emphasis added)); Schafer v. Schafer, 95 Wash.2d 78, 81, 621 P.2d 721, 723 (1980) ("Special circumstances of an equitable nature ... may justify a court crediting payments against the accrued support owing when that can be done without injustice to the one to whom the divorce decree directed the installments be paid."(emphasis added)).
Mr. Cochran argues that, under circumstances such as those presented here, a trial court has discretion in determining a proper credit to be allowed against a child-support arrearage. He also argues that the trial court's determination of such a credit "will not be reversed absent an abuse of discretion by the trial court." In both respects, he cites this Court to Kuhn v. Kuhn, 706 So.2d 1275 (Ala.Civ.App. 1997). As the Court of Civil Appeals correctly observed in Kuhn, "[a] trial court, in determining an arrearage, may allow a credit to the obligated parent upon proof that monetary support was actually provided." 706 So.2d at 1278. As the Kuhn court also correctly observed,
"`[a] trial court's determination of the amount of a child support arrearage, including the grant or refusal of a credit, is largely a discretionary matter, and the trial court's ruling in that regard will not be reversed on appeal absent an abuse of discretion.' Vlahos v. Ware, 690 So.2d 407, 410 (Ala.Civ.App.1997)."
706 So.2d at 1278; see also, e.g., Rubrigi v. Rubrigi, 630 So.2d 67, 68 (Ala.Civ.App. 1993) ("The trial court may ... allow credit against an arrearage for expenditures related to support by the obligated parent... or for amounts expended while the child actually lived with the obligated parent *1246 or a third party, and the obligated parent is able to prove that he made contributions to the child's support.").[22]
In the present case, the evidence supports the conclusion that Mr. Cochran made overpayments of child support with the specific intention of satisfying an existing child-support arrearage. He made the overpayments directly to the person to whom he owed the original payments in the first place, i.e., Mrs. Cochran. Further, the evidence would support the conclusion that Mrs. Cochran accepted these payments with knowledge that Mr. Cochran claimed they represented overpayments that were to be used to satisfy the arrearage judgments. In such an instance, I do not believe this Court can say that Mrs. Cochran is prejudiced by the allowance of a credit or that in allowing a credit the trial court abused its discretion.
As for the arguments made by Mrs. Cochran, she first contends that Mr. Cochran did not include the credit issue in his pleadings and that she did not expressly or implicitly consent to the trial of the credit issue. It is true that Mr. Cochran did not include the credit issue in his pleadings. After reviewing the record, however (see trial transcript, pp. 99-105, 205-08), I cannot conclude that the trial court erred when it implicitly determined that the parties had tried the credit issue by implied consent.
As for Mrs. Cochran's argument that paragraph 8(d) of the settlement agreement is unambiguous and, thus, that the admission of extrinsic evidence as to the meaning of the paragraph was inappropriate, I again note that paragraph 8(d) states:
"For the month following the month during which the youngest minor child begins first grade (or K-5 if such K-5 program is a full day program) and is no longer in need of childcare services, [Mr. Cochran's] child support payments shall be reduced by $500.00 of the amount then required to be made as child support."
The trial court concluded that paragraph 8(d) was in fact unambiguous, but that, in contrast to Mrs. Cochran's view of it, paragraph 8(d) called for the reduction in Mr. Cochran's child-support obligation when the younger child entered first grade in September 2004. I agree with the trial court.
*1247 When a contract contains unambiguous language, "and but one reasonable construction of the contract is possible, it must be expounded as made, for the courts are not at liberty to make new contracts for the parties." Life & Cas. Ins. Co. of Tennessee v. Bottoms, 225 Ala. 382, 383, 143 So. 574, 575 (1932). A straightforward reading of paragraph 8(d), particularly when taking into account the K-5 parenthetical, leads one to the conclusion that the "childcare services" under discussion are those that would be displaced by a normal "full-day" school program, i.e., either first grade or a full-day K-5 program. To read paragraph 8(d) otherwise tends to render any discussion of school attendance in conjunction with child-care services meaningless; all that would matter is whether the child was in need of child-care services, not whether he was attending school. Likewise, such a reading would render meaningless any need to distinguish between K-5 as a part-day program and K-5 as a full-day program, as the parenthetical clearly does.
Even assuming the foregoing understanding of paragraph 8(d) is not the only reasonable construction of that paragraph that is possible, however, it certainly is a reasonable construction of that paragraph. If that is so, then, at a minimum, paragraph 8(d) is ambiguous and was properly the subject of explanation by parol evidence admitted at trial. The trial court's conclusion as to the meaning of paragraph 8(d) is supported by that evidence. For example, Mr. Cochran testified that the younger child was in "full-time daycare" when the parties divorced and that "at the time ... we were paying my mother [$]500 a month to keep [the younger child]. And that's why that provision was in there, that the onus would be on me to continue to pay that amount until he started school." Mr. Cochran further stated, "[p]rior to [the younger child] beginning the first grade, I questioned the $500, when it would come off; and [Mrs. Cochran] sent an e-mail stating that once he started the first grade, it would come off."[23]
I cannot conclude that the trial court erred as to the meaning of paragraph 8(d) of the parties' settlement agreement.
Finally, I agree with Mrs. Cochran's argument that Mr. Cochran's credit, if due, was insufficient to satisfy the amounts of arrearage, plus interest, due under the *1248 judgments at issue. Mr. Cochran submitted an exhibit (exhibit 16) showing the amounts that he had allegedly paid to Mrs. Cochran as contrasted with the amount of child support he allegedly owed. The exhibit reflects payments between September 2004 and February 2007, and it reflects a total amount to be applied toward Mr. Cochran's arrearage of $16,071.35. As of February 2007, Mr. Cochran apparently was making overpayments of $578.72. Nothing in the record discloses, however, what specific amounts Mr. Cochran paid to Mrs. Cochran after February 2007, or, more particularly, between the April 2007 and May 2007 hearings and the entry of the August 2007 order. Likewise, though Mr. Cochran testified that he had made a lump-sum payment toward the arrearages, there is no evidence concerning the amount of the lump-sum payment or what other amounts Mr. Cochran might have paid towards the arrearages, if any. It is clear, however, that the arrearage judgments totaled $18,752.60 and $2,142.70, respectively, plus interest. Thus, the record does not support the trial court's conclusion that Mr. Cochran's credit exceeded the value of the amounts at issue that were due to Mrs. Cochran.

IV. Conclusion
Although I agree that there should be a judgment of reversal in this case, I do not agree with the conclusions upon which the main opinion bases such a judgment. Concomitantly, I do not agree with the instructions on remand provided by the main opinion. I would remand the cause for the trial court (1) to enter an order as to custody and visitation based on the factual findings that are supported by the record, and (2) to calculate the specific amount of the overpayments made by Mr. Cochran, based on the record as it presently stands, and to enter a judgment awarding Mr. Cochran a credit in that amount.
SEE, J., concurs.
NOTES
[1] At the time of her appeal, Mrs. Cochran was serving as a staff attorney for a judge on the Court of Civil Appeals.
[2] Mr. Cochran was not present when Dr. Ray made this recommendation.
[3] Letter of Dr. Kirkland to the trial court, dated September 13, 2006.
[4] The dissent cites Kuhn v. Kuhn, 706 So.2d 1275 (Ala.Civ.App.1997), and Rubrigi v. Rubrigi, 630 So.2d 67 (Ala.Civ.App.1993), in support of Mr. Cochran's claim for a credit against the arrearage. Those cases are inapposite, however, because they do not involveas this one doesan order essentially reopening a prior arrearage judgment.
[5] The settlement agreement provided that Mrs. Cochran

"shall consult with [Mr. Cochran] relative to major decisions concerning the health, education and welfare of the minor children. [Mr. Cochran] shall have equal access to the medical, dental, educational, health and welfare information, and school records regarding the children. [Mrs. Cochran] shall take into consideration [Mr. Cochran's] input into major decisions regarding the children; however in the event of a dispute, [Mrs. Cochran] shall have the final authority."
[6] Joint physical custody is especially favored in Alabama, see Ala.Code 1975, § 30-3-150 et seq., though the joint-custody statutes do not alter the applicable standard for modifying custody. Ala.Code 1975, § 30-3-157.
[7] In her brief, Mrs. Cochran relies upon some custody-modification cases that utilized an obvious-and-overwhelming-necessity-for-a-change-of-custody standard. E.g., Ex parte Martin, 961 So.2d 83, 87 (Ala.2006). Mrs. Cochran's appellate brief was filed before this Court decided Ex parte Cleghorn, 993 So.2d 462 (Ala.2008), in which we rejected that standard because it "places a nearly insurmountable burden on the party seeking a modification of custody, and, in doing so, elevates stability above the best interests of the child." Id. at 469 (overruling Ex parte Martin insofar as it suggested that a party seeking a modification of custody "must prove an overwhelming necessity for the change in custody"). See Marusich v. Bright, 947 So.2d 1068, 1073 (Ala.Civ.App.2006) (Murdock, J., dissenting) ("I cannot agree with the suggestion in the main opinion that a parent seeking to modify a prior custody order always bears a heavy burden of proof. It is true that such a parent will always have the burden of proving a material change of circumstances, without which the prior custody order will have res judicata effect. ... Once a material change of circumstances has been proven, however, the extent to which a child's interests must be promoted by a proposed change of custody (and thus the weight of the petitioning parent's ultimate burden) will depend on the degree of disruption that must be overcome before the court can conclude that the change will be in the child's best interests."); see also Lewis v. Lewis, 958 So.2d 896, 900-01 (Ala.Civ.App.2006); T.B. v. C.D.L., 910 So.2d 794, 797 (Ala.Civ.App.2005) (Murdock, J., concurring specially) ("While I agree that the latter prong of the McLendon standard appears to be met in this case, that does not foreclose an inquiry on remand into the degree of disruption that will result from the proposed change of custody ... or a recognition that the disruptive effect of the proposed custodial change in this case likely will be less than it otherwise would be because it is the custodial parent who is moving out of state and the noncustodial parent who is remaining in the same locale in which the child has resided.").
[8] For example, there was evidence that would have permitted the trial court to conclude that Mrs. Cochran, who had a long-term problem with migraine headaches that were, on occasion, incapacitating, had transposed this medical condition onto the children, when in fact they had no such headaches.
[9] In part, Mr. Cochran testified as follows:

"A. ... A lot of times when I've asked for additional time with the boys, she has put them in the middle, asking to talk to them and let them make the decision. That has physically upset them and made them very[the older child], on one occasion, became sick, threw up.
"Q. Tell the Court a little bit more about that. You said that she put them in the middle. Were the boys with you?
"A. Yes, they were with me. We called her because we were in the middle of an activity.
"Q. You and the boys called?
"A. Yes. I went to the other room, called her, asked her if we could spend some additional time together. She said that she wanted to talk to the boys and discuss it with them before she agreed to that. Once they got on the phone with her, their demeanor changed because she asked them to decide which parent they wanted to spend the afternoon with.
"Q. Is that kind of a catch-22 for you? You don't put them on the phone, and she won't let you have them; you do put them on the phoneI mean, what do youwhat do you do about that?
"A. Well, what I've done inshortly after that is I quit asking because of theif I had to put them in the middle, because it upset them and I didn't think it was fair for them to be put in the middle of those.
"Q. And you say on this particular occasion after she talked to [the older child], he threw up?
"A. Yes. He became physically ill, went to the bathroom and threw up."
Also, Mr. Cochran testified:
"Q. Now, in working with Karl Kirkland, did he give you materials to read and supporting the things that he was telling y'all about how to co-parent and leave the kids out of adult decisions and all those things?
"A. Absolutely. He gave us materials and counseled us on the importance of leaving the boys out of thebeing put in the middle of parental issues."
Dr. Kirkland testified:
"Q. Involving children in decisions about these type issues, access, parental access, visitation time, that's not good for kids is it?
"A. It's a general `never do that.' From our point of view, it's you just keep them out of that.
"Q. Then I don't need to ask you whether or not it's appropriate to say, `Well, let me ask the boys if they want to spend more time with you.'
"A. No, that would not be a good thing to do."
Later in his testimony, Mr. Cochran stated:
"Q. Do you believe that good co-parenting means reduce conflict and reduce confusion for the boys?
"A. Absolutely.
"Q. Do you believe that [Mrs. Cochran] confuses these boys?
"A. Yes. I think by including them in these co-parenting issues, it creates confusion on them andand disrupts them and anxiety.
"Q. And that level of anxiety has been pretty darn high at times, hasn't it?
"A. Yes, ma'am. It has been very high."
I also note that on cross-examination Mrs. Cochran testified:
"Q. Do you alsohave you thought about if you tell a child, `Well, I'll be here by myself,' or, `Don't you want to stay with me,' or, `I've got other plans,' that you're putting the child in the middle of a loyalty issue?
"A. [Counsel for Mr. Cochran], I love my children very much.
"Q. Do you understand that?
"A. If I had ever done that, that would be a problem. Yes."
[10] The paternal grandmother, who had witnessed the children's belligerence toward Mrs. Cochran, testified that her "biggest concern is that I see a path the boys are taking that it really scares me to think about when they're teenagers, what they're going to be like as far as their behavior, having respect for people and that kind of thing." Although the paternal grandmother stated that the children were "well-rounded," she added that "they have problems, and I think they're headed for more problems."
[11] Mrs. Cochran cites Blackston v. Blackston, 607 So.2d 1262 (Ala.Civ.App.1991), in her argument as to the visitation issue. In Blackston "[t]he father offered little legal evidence to meet his burden of showing a material change of circumstances, or that the award of joint custody would materially promote the best interests and welfare of the children." 607 So.2d at 1264. In that context, the Court of Civil Appeals stated: "`[V]isitation disputes alone are insufficient to necessitate a change in custody.' Ward v. Rodenbaugh, 509 So.2d 910, 911 (Ala.Civ.App. 1987) (citation omitted)." 607 So.2d at 1264 (emphasis added). The fuller context for the quote from Ward, however, is as follows:

"The mother is correct in stating that visitation disputes alone are insufficient to necessitate a change in custody. Pons v. Phillips, 406 So.2d 932 (Ala.Civ.App.1981). However, the record in this case can support a conclusion of more than a mere visitation problem. ... [T]he facts support the court's conclusion that the mother's conduct has affected and would continue to detrimentally affect the relationship between the father and the child. The record also supports the court's conclusion that circumstances have changed since the original divorce decree.
"The record shows that the father has remarried and is employed. He has never failed to submit to the jurisdiction of the court in this case or to comply with its orders. He has expressed his desire to see that his son obtains whatever help he needs in dealing with any psychological problems he might have. In short, the court had evidence upon which to determine that a change of custody would materially promote the child's best interests. There was evidence upon which the court could determine that the disruptive effect of a change of custody would be more than overcome by the material promotion of the child's best interests that would be afforded by the stability and protection of the father's home."
509 So.2d at 911-12 (emphasis added). I believe the record in the present case likewise demonstrates that more than a mere visitation dispute is at issue.
[12] In particular, I note that the trial judge apparently read Dr. Kirkland's deposition after the trial. It appears that the trial court attributed some of the testimony from witnesses at trial to Dr. Kirkland and that it used the testimony of some witnesses at trial to draw inferences as to Dr. Kirkland's deposition testimony. As to the latter, I do not believe all such inferences would be inappropriate.
[13] The August 2007 order itself indicates that the trial court was not describing all evidence that might support its findings. Further, even if some of the trial court's findings are erroneous, the proper instruction on remand would be for the trial court to review the record and to enter a judgment without taking into account any erroneous findings; that judgment might or might not be in favor of modification.

I also note that, even assuming modification of physical custody, per se, is not appropriate, there is ample evidence in the record to support a decision to award Mr. Cochran substantial additional scheduled visitation and to take such award into account in determining the appropriate amount of child support due Mrs. Cochran. See Rule 32(A)(1)(a), Ala. R. Jud. Admin. In response to a question by the trial court regarding what visitation should be awarded if Mrs. Cochran retained physical custody, Mr. Cochran requested a 60/40 division of time, as Dr. Kirkland had recommended. Also, Mrs. Cochran testified that she did not oppose more time for Mr. Cochran than was allowed under the divorce judgment. In fact, she did not object to the parties having custody on alternate weeks during the summer of 2007 as part of the trial court's interim custody order.
[14] It is well settled that the age of a child is "a very important consideration" in making an initial custody award. Ex parte Devine, 398 So.2d 686, 696 (Ala.1981); see also Sockwell v. Sockwell, 822 So.2d 1219 (Ala.Civ.App. 2001), cited in the above-quoted argument of Mrs. Cochran. I am perplexed as to why the age of a child is "a very important consideration" in making an initial custody award, Ex parte Devine, 398 So.2d at 696, yet, as a matter of law, a substantial change in that very important consideration cannot constitute a change in circumstances that might warrant a trial court's considering whether, in light of age and other factors, a child's best interests might be materially promoted by a change in custody. Compare Fordyce v. Fordyce, 242 S.W.2d 307, 314 (Mo.Ct.App.1951) ("The fact that the children have grown older in and of itself is no sufficient change of condition to warrant a change in custody." (emphasis added)), with Bernstein v. Bernstein, 80 Cal.App.2d 921, 923, 183 P.2d 43, 44 (1947) ("In her opening brief plaintiff contended that there was no evidence of any change of circumstances between the entry of the decrees and the time of application for modification. However, on the argument, plaintiff abandoned this point, as well she might, because the evidence showed that there was a decided change of circumstances. First, the child had grown older. At the time of the interlocutory decree the child was four months old; at the time of the final decree sixteen months old; at the time of the hearing it was practically two years old. It is now three years old. The child had changed from an infant requiring close attention and constant care to a youngster requiring less immediate attention and entitled to start getting acquainted with its father.").
[15] In addition to all the other evidence of record pertinent to this issue, I note that, when asked whether "[w]hen boys get older, they have different needs," Dr. Kirkland responded, "They do."

I also note that the main opinion quotes from the Court of Civil Appeals' opinion in K.E.W. v. T.W.E., 990 So.2d 375, 380 (Ala.Civ. App.2007), for the following proposition: "`A material change of circumstances occurs when important facts unknown at the time of the initial custody judgment arise that impact the welfare of the child.'" ___ So.3d at ___ (emphasis added). To the extent this passage can be read as suggesting that a material change of circumstances cannot be based on facts that were known at the time of an initial custody judgment (i.e., the fact that the boys would grow older and experience a resulting change in their needs), but which actually occur at some subsequent point in time, I disagree with it. Our courts have held that custody determinations must be based upon current facts and not on speculation as to what will happen in the future. E.g., Hovater v. Hovater, 577 So.2d 461, 463 (Ala.Civ.App. 1990) ("We find ... the custodial reversionary clause in this instance to be of no effect because it is premised on a mere speculation of what the best interests of the children may be at a future date." (emphasis added)); see also S.M. v. State Dep't of Human Res., 598 So.2d 975, 978 (Ala.Civ.App.1992) ("After reviewing all of the evidence in a custody case, the trial court weighs certain factors[,] ... considers all the evidence[,] and decides which party would better promote the child's best interests at this time." (emphasis added)); Thompson v. Thompson, 431 So.2d 1310, 1310 (Ala. Civ.App.1983) ("The present rule is simply that custody of a young child is awarded according to the best interest of the child as disclosed by the particular facts in each case.... [T]here was competent evidence upon which the trial court could validly determine that, at the present time, it is to the best interest of the child that she be in her father's general care, custody and control."). It would be inconsistent with this latter line of authority to say that developments that the trial court "knows" will occur in the future, but that have not occurred at the time of an initial custody judgment, cannot be taken into consideration in the future when they finally do occur. If this were so, then given the above-cited cases, such developments could not find their way into either the initial or the subsequent custody determination.
[16] When questioned whether the child was "being belligerent at the time of the divorce or now," the paternal grandmother responded, "I'm talking about after the divorce, and this has gradually gotten this way." She noted that the children were not "kidding" when the belligerent incidents occurred. She further stated that "at first it was verbal, and then it became physical." When questioned whether the belligerence had "gotten better or worse over the years," the paternal grandmother responded "it really hasn't gotten a lot better, but [the older child] is quieter about things now. He just goes off and is kind of quiet. [The younger child] is still very vocal."

I note that Mrs. Cochran denied that the above-described belligerent incidents occurred at all. This is just one example of a direct conflict between the testimony of Mrs. Cochran and that of other witnesses, which directly brought her credibility into question at trial. (The record contains other examples as well.) Based on the trial transcript and the language used in the trial court's judgment in favor of Mr. Cochran, it is clear to me that the trial court rejected Mrs. Cochran's testimony and accepted that of some of the other witnesses, i.e., particularly that of Mr. Cochran and the paternal grandmother. I may not have made that same determination had I been the trial judge and had I been able to observe the witnesses at trial. Nonetheless, in light of the well settled principles (1) "that it is the [fact-finder's] province to resolve conflicts in testimony ... and to judge the credibility of witnesses" and (2) that a fact-finder "concluding that any witness was willfully not truthful about one material aspect of his or her testimony is free to disregard all or any part of the testimony," Flint Constr. Co., 904 So.2d at 250, I cannot see my way clear to reach the result the main opinion reaches in the present case.
[17] This should not be read as support for the proposition that such behavior alone would be sufficient to warrant a change of custody in a particular case. At issue here is only the basis for the main opinion's decision, i.e., whether the noncustodial parent has offered sufficient evidence of a material change of circumstances since the entry of the previous custody judgment.
[18] In addition to the other evidence in the record, including the fact that Mr. Cochran lived in close proximity to Mrs. Cochran, Dr. Kirkland testified that he did not believe a "reallocation of time" between the parties would be detrimental to the children and that he believed it would be beneficial to the children.
[19] I do not intend hereby to express any view as to what ruling I would have made had I been the trial judge in this case.
[20] The child-support award was also subject to other adjustments (thus, the $2,973.21 figure discussed by the trial court), such as a cost-of-living adjustment, which are not at issue in the present case.
[21] Mrs. Cochran does not argue that, assuming a credit is otherwise permissible, the trial court erred or exceeded its discretion by awarding a credit under the circumstances.
[22] The main opinion's statement that Kuhn and Rubrigi are inapposite reflects a fundamental misunderstanding of the nature of past-due child-support obligations and arrearage judgments. "[C]hild support payments become final judgments when due and thereafter cannot be changed." Cox v. Dunn, 669 So.2d 963, 966 (Ala.Civ.App.1995); see, e.g., Ex parte State ex rel. Daw, 786 So.2d 1134, 1137 (Ala.2000) ("[T]he character of the [child support] obligation changes once it becomes delinquent, because the fact of the delinquency causes the party to whom the debt is owed to become a judgment creditor, a creditor who may then pursue the typical means of collection that are available to the holder of any judgment."). A child-support-arrearage judgment simply reflects a trial court's adding up existing final judgments for past-due child support (plus any interest that might be due). Yet, as Kuhn and Rubrigi note, the awarding of a credit against such final judgments, i.e., past-due child-support obligations, in an arrearage proceeding is within the discretion of the trial court and is not considered an impermissible modification of the already existing final judgments, i.e., the past-due child-support obligations. There is no logical, legal distinction between awarding a credit for payments made against a final judgment that is reflected by a past-due child-support obligation itself and awarding a credit for payments made against a final judgment that states the total amount of past-due child-support amounts, plus interest, owed. Kuhn and Rubrigi are thus not inapposite; they establish the very point at issue: equity authorizes a trial court to award a credit against (but not make a modification of) a final judgment in appropriate circumstances.
[23] Mrs. Cochran sent an e-mail to Mr. Cochran on February 27, 2004, stating:

"Our agreement specifically states that the $500 is to be discontinued the month after [the younger child] begins 1st grade (or K-5 if K-5 is a full day program). K-5 at [the school he will be attending] is not a full day program, it is a 1/2 day program. [The younger child] has required childcare since he began K-5. I enrolled him in [a particular program] in order to meet his childcare needs. Thus, according to the agreement, the triggering event for discontinuing the $500 childcare amount will occur when [the younger child] starts 1st grade and your September 2004 payment will be reduced by $500."
Thereafter, Mr. Cochran informed Mrs. Cochran that he would continue to pay the $500 after the younger child began first grade, but that it should be applied against his child-support arrearage. As noted above, after consulting her attorney, Mrs. Cochran's opinion as to the nature of the parties' agreement concerning the $500 reduction changed. Mr. Cochran testified that Mrs. Cochran took the position that the $500
"would not roll off; and so I contended that it should by her earlier e-mail and our agreement through that whole process. Sobut in order to stay in good faith and work through the child issues that we had, the visitation issues, I continued to pay it. And I've paid it ever since."
(Emphasis added.) Mr. Cochran continued, "I would plead with the Court to apply that towards the arrearage because, again, I was paying it in good faith to keep us on the right road on the boys' visitation schedules."